UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| INTERBANK FUNDING CORP., et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| IBF FUND LIQUIDATING LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 07-CV-10665 (DAB)(ECF) |
| | ) 07-CV-10692 (DAB)(ECF) |
| CHADMOORE WIRELESS GROUP INC., | ) 07-CV-10693 (DAB)(ECF) |
| CHADMOORE SHAREHOLDER LIQUIDATING | ) |
| TRUST, ROBERT MOORE and STEPHEN RADUSCH, | ) |
| | ) |
| Defendants. | ) |

**APPELLEE AND CROSS-APPELLANT'S BRIEF**

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022

31577129.DOC

**Table of Contents**

                                                                                    **Page**

PRELIMINARY STATEMENT ....................................................................................... 1

STANDARD OF REVIEW .......................................................................................... 4

STATEMENT OF FACTS .......................................................................................... 5
     A.     Chapter 11 Cases; ICA Trustee ...................................................... 5
     B.     Liquidating Plan Confirmed, Effective ........................................... 5
     C.     Referral of Post-Confirmation Jurisdiction to the Bankruptcy Court ................... 6
     D.     The Sale of US Mills to Sunset ...................................................... 6
          1.     The First Iteration ................................................... 6
          2.     The Second Iteration ............................................... 6
          3.     The Last Iteration ................................................... 7
     E.     The Chadmoore Put ...................................................................... 8
     F.     Moore's Execution of the Chadmoore Put ...................................... 9
     G.     Chadmoore's Refusal to Honor the Chadmoore Put ...................... 10
     H.     Fund LLC's Complaint .................................................................. 11
     I.     Preliminary Motion Practice ......................................................... 12
     J.     The Preliminary Injunction .......................................................... 13
     K.     Moore's Failure to Comply with the PI Order .............................. 13
     L.     The Contempt Orders and Moore's Continued Non-Compliance......... 14
     M.     Summary Judgment ...................................................................... 15

ARGUMENT .......................................................................................................... 17

I.     THE BANKRUPTCY COURT RULED THAT IT HAD SUBJECT MATTER
     JURISDICTION OVER THIS ADVERSARY PROCEEDING BEFORE IT
     DECIDED THE SUMMARY JUDGMENT MOTIONS ................................. 17

II.     EVEN IF THE BANKRUPTCY COURT HAD FAILED TO CONSIDER
     WHETHER IT HAD SUBJECT MATTER JURISDICTION OVER THE
     ADVERSARY PROCEEDING BEFORE IT DECIDED THE SUMMARY
     JUDGMENT MOTIONS, REVERSAL WOULD NOT BE WARRANTED ................. 19
     A.     The Bankruptcy Court Has Jurisdiction Over This Lawsuit As A Matter
          "Arising In" The Debtors' Chapter 11 Cases ................................ 20
     B.     At A Minimum, The Bankruptcy Court Had "Related To" Jurisdiction
          Over This Lawsuit ....................................................................... 23
     C.     The Bankruptcy Court Had Inherent Or Ancillary Jurisdiction To Interpret
          And Enforce the Sale Orders ....................................................... 24
     D.     The Bankruptcy Court Properly Determined That Fund LLC's Claims
          Against Moore Fall Under The Jurisdiction Delegated To It By The
          District Court As Part Of The SEC Enforcement Action ....................... 25
     E.     The Plan And Sale Orders Reserved Sufficient Jurisdiction For The
          Bankruptcy Court To Address Fund LLC's Claims ......................... 26

III.  THE BANKRUPTCY COURT CORRECTLY GRANTED SUMMARY
JUDGMENT AGAINST MOORE FOR BREACHING NEW YORK'S IMPLIED
WARRANTY OF AUTHORITY ..................................................................28

    A.  Moore's Reliance Argument Is Erroneous ..........................................28

        1.  Moore Waived His Reliance Argument By Not Raising It Below ...........29

        2.  Reliance Is Not A Defense To An Implied Warranty Of Authority
Claim ...................................................................................29

    B.  Chadmoore's Dissolution Is Not A Defense To Fund LLC's Implied
Warranty Of Authority Claim ...............................................................32

        1.  New York Law is Clear, and the Bankruptcy Court Recognized,
that An Officer that Contracts Without Authority on Behalf of a
Dissolved Corporation is Personally Liable for the Corporation's
Liabilities ............................................................................32

        2.  Chadmoore Was Legally Capable of Entering Into the Chadmoore
Put ......................................................................................33

        3.  Chadmoore Was Precluded From Challenging the Enforceability of
the Chadmoore Put Under Colorado Law ..................................36

IV.  FUND LLC's CROSS-APPEAL:  THE BANKRUPTCY COURT ERRED IN
GRANTING SUMMARY JUDGMENT IN FAVOR OF MOORE ON THE
COLORADO PERSONAL LIABILITY STATUTE..........................................37

V.  THE PRELIMINARY INJUNCTION WAS APPROPRIATE .........................41

    A.  The Preliminary Injunction Was Not An Improper Prejudgment
Attachment And Did Not Violate *Grupo Mexicano* .............................42

    B.  The Bankruptcy Court's Entry Of The Preliminary Injunction Based On
The Record Below Was Not An Abuse Of Discretion..........................44

VI.  THE CONTEMPT FINDING WAS SUPPORTED .......................................45

    A.  Moore Failed To Carry His Burden Of Establishing His Inability To Post
Any Of His Required Escrow..............................................................45

    B.  The Bankruptcy Court Properly Determined That Moore Failed To Make
The Complete And Accurate Financial Disclosures Required............................48

CONCLUSION ...........................................................................................50

# Table of Authorities

**Page**

## CASES

711 Kings Highway Corp. v. F.I.M.'s Marine Repair Service, Inc.,
    273 N.Y.S.2d 299 (N.Y. Sup. Ct. 1966)........................................................ 36

Adelphia Comms. Corp. v. Rigas (In re Adelphia Comms. Corp.),
    323 B.R. 345 (Bankr. S.D.N.Y. 2005) ....................................................... 43

Adelphia Comms. Corp. v. Rigas (In re Adelphia Comms. Corp.),
    Case No. 02-8495, 2003 WL 21297258 (S.D.N.Y. June 4, 2003)........................... 43

Anthony v. City of New York,
    339 F.3d 129 (2d Cir. 2003) ....................................................................... 29

Awanderlust Travel, Inc. v. Kochevar,
    21 P.3d 876 (Colo. Ct. App. 2001).............................................................. 34

Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.),
    410 F.3d 100 (1st Cir. 2005) ..................................................................... 22

Bowditch v. 57 Laight St. Corp.,
    443 N.Y.S.2d 785 (N.Y. Sup. Ct. 1981)...................................................... 34

Brandes Meat Corp. v. Cromer,
    537 N.Y.S.2d 177 (2d Dep't 1989) ............................................................. 32

Broughton v. Dona,
    475 N.Y.S.2d 595 (3d Dep't 1984) .......................................................... 30, 33

Bryant Constr. Co., Inc. v. Cook Constr. Co., Inc.,
    518 So.2d 625 (Miss. 1987) ...................................................................... 36

CFTC v. Wellington Precious Metals,
    950 F.2d 1525 (11th Cir. 1992).................................................................. 46

CSC Holdings, Inc. v. Redisi,
    309 F.3d 988 (7th Cir. 2002).............................................................42, 43, 44

Campbell v. Muller,
    43 N.Y.S. 233 (N.Y. App. Term 1897)...................................................... 30

Cargo Ships El Yam, Ltd. v. Stearns & Foster Co.,
    149 F. Supp. 754 (S.D.N.Y. 1955)............................................................ 29

**Page**

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ............................................................................... 36, 37

Celotex Corp. v. Edwards,
    514 U.S. 300 (1995) ................................................................... 22

Christman v. Maristella Compania Naviera,
    293 F. Supp. 442 (S.D.N.Y. 1968) ................................................ 29

Connecticut Nat'l Bank v. Germain,
    503 U.S. 249 (1992) ................................................................... 38

Credit Agricole Indosuez v. Rossiyskiy Kredit Bank,
    94 N.Y.2d 541 (2000).................................................................. 42

Dung v. Parker,
    52 N.Y. 494 (1873)..................................................................... 33

Encogen Four Partners v. Niagara Mohawk Power Corp.,
    914 F. Supp. 57 (S.D.N.Y. 1996) ................................................ 30

Ferguson v. Neighborhood Housing Servs.,
    780 F.2d 549 (6th Cir. 1986) ....................................................... 22

Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.),
    505 F.3d 237 (3d Cir. Oct. 24, 2007) ..................................... 20, 21, 23

Green v. Drexler (In re Feis & Drexler Inc.),
    760 F.2d 406 (2d Cir. 1985) ....................................................... 43

Grimes v. Graue (In re Haws),
    158 B.R. 965 (Bankr. S.D. Tex. 1993).......................................... 24

Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,
    527 U.S. 308 (1999) ........................................................... *passim*

Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,
    530 U.S. 1 (2000) ...................................................................... 38

Huber v. Marine Midland Bank,
    51 F.3d 5 (2d Cir. 1995)............................................................ 45, 46

Igbara Realty Corp. v. New York Prop. Ins. Underwriting Ass'n,
    463 N.Y.S.2d 211 (1st Dep't 1983)............................................. 34

Imero Fiorentino Assocs., Inc. v. Green,
    447 N.Y.S.2d 942 (1st Dep't 1982).............................................. 33

**Page**

Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.,
    411 F. Supp. 2d 458 (S.D.N.Y. 2006) ....................................................... 22

Jean Claude Boisset Wines USA, Inc. v. Newton,
    830 P.2d 1134 (Colo. Ct. App. 1992)....................................................... 38, 41

Kassover v. Prism Venture Partners, LLC (In re Kassover),
    336 B.R. 74 (Bankr. S.D.N.Y. 2006) ....................................................... 23

Kay Furniture Corp. v. Rovin,
    20 N.W.2d 194 (Mich. 1945) .................................................................. 34

Klein v. Guglielmi,
    Index No. 100471/00, 2001 WL 1682934 (N.Y. Sup. Ct. Sept. 26, 2001) .............. 33

Knight v. U.S. Fire Ins. Co.,
    804 F.2d (2d Cir. 1986)........................................................................... 36

LTV Corp. v. Back (In re Chateaugay Corp.),
    201 B.R. 48 (Bankr. S.D.N.Y. 1996), aff'd in relevant part,
    213 B.R. 633 (S.D.N.Y. 1997) ................................................................ 24

Liberian Int'l Ship & Corp. Registry, LLC v. Allfirst Bank (In re Millenium
    Seacarriers, Inc.),
    Case No. 02-7108, 2004 WL 63501 (S.D.N.Y. Jan. 14, 2005)................................ 19

Live Nation Worldwide, Inc. v. GTA, Inc.,
    Case No. 07-483, 2007 WL 1489761 (S.D.N.Y. May 18, 2007)............................. 36

Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),
    304 F.3d 223 (2d Cir. 2002) ..................................................................... 20

Maggio v. Zeitz,
    333 U.S. 56 (1948) ................................................................................ 45

In re MarketXT Holdings Corp.,
    Case No. 04-12078, 2006 WL 408317 (Bankr. S.D.N.Y. Jan. 27, 2006) ................ 45

McPhaul v. United States,
    364 U.S. 372 (1960) .............................................................................. 45

Micciche v. Billings,
    727 P.2d 367 (Colo. 1986) ................................................................. 38, 39, 40

Moore v. Maddock,
    251 N.Y. 420 (1929).............................................................................. 30

Motorola Credit Corp. v. Uzan,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002) ..................................................... 43

**Page**

Nachom v. Citigroup, Inc. (In re Global Crossing, Ltd., Securities Lit.),
    Case No. 02-910, 2003 WL 22705127 (S.D.N.Y. Nov. 14, 2003) .......................... 20

O'Shanter Resources, Inc. v. Niagara Mohawk Power Corp.,
    915 F. Supp. 560 (W.D.N.Y. 1996) ........................................................................ 31

Official Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re
    Bennett Funding Group),
    146 F.3d 136 (2d Cir. 1998) ................................................................................... 4

Official Comm. of Unsecured Creditors v. Sphinx Managed Futures Fund SPC (In re
    Refco Inc.),
    Case No. 05-03331 (Bankr. S.D.N.Y. Dec. 16, 2005) ............................................. 43

Ogilvy Group Sweden, AB v. Tiger Telematics, Inc.,
    Case No. 05-8488, 2006 WL 2473215 (S.D.N.Y. Aug. 28, 2006) .......................... 30

Payment Alliance Intern, Inc. v. Perreira,
    Case No. 07-8685, 2007 WL 4698605 (S.D.N.Y Dec. 13, 2007)............................ 44

Pennsylvania Bldg. Co. v. Schaub,
    789 N.Y.S.2d 112 (1st Dep't 2005)........................................................................ 32

Penthouse Media Group v. Guccione (In re General Media, Inc.),
    335 B.R. 66 (Bankr. S.D.N.Y. 2005) ............................................................... 22, 24

Piambino v. Bestline Prods., Inc.,
    645 F. Supp 1210 (S.D. Fla 1986)................................................................... 46, 47

Poritzky v. Wachtel,
    27 N.Y.S.2d 316 (N.Y. Sup. Ct. 1941)................................................................... 33

Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.),
    980 F.2d 110 (2d Cir. 1992).................................................................................. 23

Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.,
    144 F. Supp. 2d 241 (S.D.N.Y. 2001) .................................................................... 43

Ramsameachire v. Ashcroft,
    357 F.3d 169 (2d Cir. 2004) .................................................................................. 29

Rubin v. Pringle (In re Focus Media, Inc.),
    387 F.3d 1077 (9th Cir. 2004)......................................................................... 42, 43

S.E.C. v Bilzerian,
    112 F. Supp. 2d 12 (D.D.C. 2000) ................................................................... 46, 47

S.E.C. v. Bremont,
    Case No. 96-8771, 2003 WL 21398932 (S.D.N.Y. June 18, 2003)......................... 46

**Page**

S.E.C. v. Cavanaugh,
       445 F.3d 105 (2d Cir. 2006) ........................................................................    44

S.E.C. v. Musella,
       818 F. Supp 600 (S.D.N.Y. 1993) ..............................................................    46

S.E.C. v. Porto,
       748 F. Supp 671 (N.D. Ill. 1990)................................................................    46

Schenectady Municipal Housing Auth. v. Keystone Metals Corp.,
       665 N.Y.S.2d 744 (3d Dep't 1997) .............................................................    34

Sims v. Ottenhoff,
       879 P.2d 436 (Colo. Ct. App. 1994)......................................................    38, 41

United States ex rel. Rahman v. Oncology Assocs., P.C.,
       198 F.3d 489 (4th Cir. 1999) .................................................................    42, 43

United States v. Hayes,
       722 F.2d 723 (11th Cir. 1984) ...................................................................    47

United States v. Ron Pair Enters.,
       489 U.S. 235 (1989) ...................................................................................    38

United States v. Rylander,
       460 U.S. 752 (1983) ...................................................................................    45

Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.),
       419 F.3d 83 (2d Cir. 2005) .........................................................................    24

Wishnatzki Natel, Inc. v. H.P. Island-Wide, Inc.,
       2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ............................................    43

WorldCom, Inc. v. Sandoval,
       701 N.Y.S.2d 834 (N.Y. Sup. Ct. 1999)....................................................    33

## STATUTES AND OTHER AUTHORITIES

11 U.S.C. § 105(a).........................................................................................    42, 43

28 U.S.C. § 1334 ...........................................................................................    *passim*

28 U.S.C. § 151 .................................................................................................    20

28 U.S.C. § 157(a).............................................................................................    20

28 U.S.C. § 157(b)(1).........................................................................................    4

28 U.S.C. § 157(b)(2).........................................................................................    4

**Page**

Fed. R. Civ. P. 1 ............................................................................ 36

Fed. R. Civ. P. 12(b)(6) .................................................................. 12

Fed. R. Civ. P. 65 .......................................................................... 42

Fed. R. Bank. P. 7012(h) ............................................................... 12

Fed. R. Bankr. P. 8013 .................................................................... 4

Fed. R. Bankr. P. 9020 .................................................................. 45

C.R.S. § 7-3-104 (1973) ............................................... 37, 38, 39, 40

C.R.S. § 7-114-105 (2006) ............................................................ 33

C.R.S. § 7-103-104 (2006) ............................................................ 36

C.R.S. § 7-102-104 (2006) ...................................................... *passim*

Restatement (Second) of Agency § 329 ......................................... 31

Restatement (Third) of Agency § 6.10 .................................. 28, 30, 31

Model Bus. Corp. Act § 14.05 ......................................................... 33

8 Collier on Bankruptcy ¶ 1142.04[1] (15th ed. rev.) ...................... 20

Plaintiff-Appellee and Cross-Appellant IBF Fund Liquidating LLC ("Fund LLC") respectfully submits this brief (i) in opposition to Defendant-Appellant Robert Moore's ("Moore") appeal from the three final judgments (AP docket no. 185, 188 and 191) (respectively, Vol. I, Tabs C, D and E)[1] of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and (ii) in support of its cross-appeal ("Cross-Appeal") of the Final Judgment (the "Final Judgment") (AP docket no. 188) entered by the Bankruptcy Court on October 9, 2007 which, while granting summary judgment to Fund LLC on Count VI of the Complaint (as defined below) (AP docket no. 1) (Vol. I, Tab F), also granted summary judgment to Moore on Fund LLC's alternative theory under Count VI of the Complaint that Moore's misconduct violated the Colorado personal liability statute, C.R.S. § 7-102-104.

## PRELIMINARY STATEMENT

In this consolidated appeal, Moore, a confessed liar and wrongdoer, challenges the Bankruptcy Court's entry of three final judgments that: (i) granted summary judgment against Moore on Count VI of Fund LLC's Complaint for breach of the implied warranty of authority under New York law because Moore signed a credit enhancement on behalf of Chadmoore Wireless Group Inc. ("Chadmoore"), the Convertible Debenture Sale Agreement dated November 10, 2005 (the "Chadmoore Put") (AP docket no. 1, Ex. A) (Vol. I, Tab B), when, as Moore has admitted, he knew he lacked the authority to act on Chadmoore's behalf; (ii) granted Fund LLC a preliminary injunction (the "PI Order") (AP docket no. 48) (Vol. I, Tab G) requiring Moore to deposit into escrow his share ($423,535.50) of an improper shareholder distribution that he authorized from Chadmoore in October 2006, and (iii) imposed sanctions against Moore for

---

[1] Unless otherwise indicated, the relevant facts and non-legal authorities are taken from the accompanying volumes of exhibits compiled from the parties' designations on this appeal and cross-appeal and are referred to as "Vol __, Tab __". Further, docket references made herein indicate the docket number assigned in the Adversary Proceeding and will be referred to as "AP docket no."

his blatant violation of the PI Order, including failing to deposit any portion of the ordered escrow amount.

Moore's appeal should be rejected in its entirety for the following reasons:

First, Moore asserts that the Bankruptcy Court erred by allegedly failing to decide his motion to dismiss for lack of subject matter jurisdiction before ruling on summary judgment. Contrary to Moore's assertions, the Bankruptcy Court squarely ruled that it had subject matter jurisdiction over this Adversary Proceeding both prior to entering the PI Order and when it decided the summary judgment motions.  On both occasions, the Bankruptcy Court ruled correctly that it had subject matter jurisdiction both because the Adversary Proceeding is a proceeding "arising in" the Debtors' chapter 11 cases and because Fund LLC's claims against Moore fall under the jurisdiction delegated to it by this Court as part of the SEC Enforcement Action (as defined below).  Certainly, at a minimum, the Bankruptcy Court could have exercised "related to" jurisdiction over the Adversary Proceeding.  Moreover, separate and apart from the statutory basis for jurisdiction, the Bankruptcy Court had inherent or ancillary jurisdiction to consider whether Moore committed fraud in connection with a sale it approved – the sale of U.S. Mills, Inc. ("US Mills").  Finally, the Bankruptcy Court's exercise of jurisdiction was particularly appropriate because the joint liquidating plan confirmed in these cases (as amended, the "Plan") and the relevant orders approving the sale of US Mills reserved jurisdiction for the Bankruptcy Court to address Fund LLC's claims.

Second, Moore argues that the Bankruptcy Court erred in granting summary judgment in favor of Fund LLC on its implied warranty of authority claim under Count VI of the Complaint because the Bankruptcy Court (i) failed to consider whether Fund LLC reasonably relied upon Moore's authority to enter into the Chadmoore Put, and (ii) disregarded New York law purportedly refusing to impose liability against an agent for breach of the implied warranty of

authority where the principal would not have been bound on the contract.  Neither argument has merit.  Moore's reliance argument, which was <u>not</u> raised below, is, in any event, contrary to controlling New York law that clearly holds that a breach of implied warranty of authority is a claim based on contract and, therefore, lack of justifiable reliance is not an element of the claim.  Moreover, the Bankruptcy Court correctly found that in cases such as this one involving dissolved corporations, the agent is liable for breach of the implied warranty of authority regardless of whether the contract could be enforced against the dissolved corporation.  Even assuming <u>arguendo</u> that the ability to enforce the contract against the dissolved corporation was a prerequisite to imposing liability on Moore, it is clear from the record below that the Chadmoore Put could have been enforced against Chadmoore.

Additionally, Fund LLC cross-appeals from that part of the Final Judgment that granted summary judgment in favor of Moore on Fund LLC's claim under Count VI of the Complaint that Moore was liable under the Colorado personal liability statute, C.R.S. § 7-102-104, for signing the Chadmoore Put without authority.  The Bankruptcy Court erred by ignoring the plain language of the Colorado personal liability statute and by relying on Colorado precedent interpreting an older and more restrictive version of the statute than was in force and at issue here, ruling that the statute only applied to pre-incorporation activities.  The Colorado personal liability statute provides an independent basis for granting summary judgment in favor of Fund LLC on Count VI.

Third, Moore asserts that the preliminary injunction was entered in error because it was essentially a prejudgment attachment that is invalid under <u>Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308 (1999).  This argument is baseless.  The preliminary injunction was not a prejudgment attachment.  Rather, it related solely to Fund LLC's equitable claims for fraudulent transfer or demands for accountings and required Moore to deposit into

escrow the dividend he received as part of the improper shareholder distribution he caused Chadmoore to make in October 2006, and, as such, was permissible.  The injunction did not violate <u>Grupo Mexicano</u>.  Moore ignores the legion of cases distinguishing <u>Grupo Mexicano</u> on its facts and approving asset-freezing injunctions in anticipation of judgments on fraudulent transfer claims or demands for accountings, the precise claims made in this case by Fund LLC.

Lastly, Moore argues that the Bankruptcy Court's judgments holding him in contempt were plainly erroneous because they lacked evidentiary support.  But the Bankruptcy Court correctly found that Fund LLC had made a <u>prima</u> <u>facie</u> showing of civil contempt and that Moore had failed to carry his burden of establishing his inability to post <u>any</u> of his required escrow, thus justifying the contempt finding and imposition of sanctions.  Moreover, the Bankruptcy Court properly determined that Moore failed to make the complete and accurate financial disclosures required by the PI Order and subsequent contempt orders.

## <u>STANDARD OF REVIEW</u>

This lawsuit is a civil proceeding "arising in" a case under title 11; thus, bankruptcy jurisdiction lies under 28 U.S.C. § 1334(b).  As a matter "arising in" a title 11 case, this is a "core proceeding" for purposes of 28 U.S.C. § 157(b)(2).  In a core proceeding, a bankruptcy court is authorized to enter final orders and judgments.  28 U.S.C. § 157(b)(1).  When a district court exercises appellate review over a bankruptcy court's decision, findings of fact made by the Bankruptcy Court shall not be set aside unless "clearly erroneous." Fed. R. Bankr. P. 8013.  Conclusions of law made by the Bankruptcy Court are reviewed <u>de</u> <u>novo</u>.  <u>Official Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re Bennett Funding Group)</u>, 146 F.3d 136, 138 (2d Cir. 1998).  Accordingly, the Bankruptcy Court's finding of facts relating to the issuance of the preliminary injunction and the imposition of sanctions are reviewed under a clearly erroneous standard.  Furthermore, the Bankruptcy Court's findings that Moore executed

the Chadmoore Put without authority intending that it not be enforceable against Chadmoore are reviewed under a clearly erroneous standard.  The Bankruptcy Court's conclusions of law that Moore breached an implied warranty of authority under New York law, but did not violate the Colorado personal liability statute, are reviewed de novo.

## STATEMENT OF FACTS

**A.    Chapter 11 Cases; ICA Trustee**

On June 7, 2002, InterBank Funding Corp. ("IBF"), IBF Collateralized Finance Corp. ("CFC") and IBF VI-Secured Lending Corp. ("SLC" and, collectively with CFC, the "Funds") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On November 4, 2002, an affiliated entity, IBF Premier Hotel Group, Inc. (collectively, with IBF and the Funds, the "Debtors"), filed its voluntary chapter 11 petition (collectively, the "Chapter 11 Cases").

On July 23, 2002, the SEC filed a complaint against IBF, the Funds, and Simon A. Hershon (the former principal) in this Court (the "SEC Enforcement Action").  On December 5, 2002, on motion of the SEC, Judge Martin entered partial summary judgment in favor of the SEC and appointed the ICA Trustee for the Funds and their respective subsidiaries.

**B.    Liquidating Plan Confirmed, Effective**

On May 28, 2003, the ICA Trustee filed the Plan with the Bankruptcy Court.  The Plan was confirmed by the Bankruptcy Court on August 14, 2003, and approved in its entirety by Judge Martin on September 5, 2003.

On December 10, 2003, the Plan went effective as it pertains to the Funds and IBF Hotel.  The Plan is being administered by Fund LLC under the supervision of its manager and liquidating agent, the ICA Trustee.  In general, the Plan provides for the orderly liquidation of the Funds' assets, with the net proceeds to be distributed to the Funds' creditors – principally, individual investors who bought debt securities issued by the Funds.

**C.**    **Referral of Post-Confirmation Jurisdiction to the Bankruptcy Court**

The Plan (§§ 14.1 & 14.2) divided post-confirmation jurisdiction between the Bankruptcy Court and this Court; Section 14.2 provided that the Bankruptcy Court would have jurisdiction "(c) to hear and determine such litigation as may be commenced by the ICA Trustee in the Bankruptcy Court on or after the Effective Date to collect assets of the Debtors[]" and "(h) such other matters as the District Court may refer to the Bankruptcy Court." Under section 14.1(b), this Court (Sprizzo, J., by reassignment) referred post-confirmation jurisdiction over matters respecting the disposition of the Funds' assets back to the Bankruptcy Court as provided for in section 14.2(h). See July 8, 2004 Referral Order at ¶ 1, Vol. I, Tab H (SEC Enfor. Action- Case No. 02-5713, docket no. 78).

**D.**    **The Sale of US Mills to Sunset**

**1.**    **The First Iteration**

In March 2005, Fund LLC (AP docket no. 114, Ex. E) sought and obtained approval (AP docket no. 114, Ex. F) from the Bankruptcy Court to sell US Mills to Sunset Brands, Inc. ("Sunset"). US Mills was an organic cereal company owned by Fund LLC. The original terms ("First Iteration") called for Sunset to provide $17 million in cash plus preferred stock and warrants exercisable into common stock of Sunset with a value of $3 million. See Original Sale Mot. at p.2, Vol. I, Tab I and Original Sale Order, Vol. I, Tab J. When Sunset was unable to obtain the necessary financing, the deal was terminated. On May 20, 2007, Sunset's $1 million of earnest money was released to US Mills. See May 20, 2005 Letter (AP docket no. 114, Ex. H, Vol. I, Tab K.

**2.**    **The Second Iteration**

In June 2005, the deal was resurrected and Fund LLC filed a motion ) seeking approval to sell US Mills to Sunset on revised terms. Under the revised terms ("Second Iteration"), Sunset

agreed to purchase US Mills for $12 million in cash, plus $5 million in subordinated notes, plus $3 million in a convertible debenture. The Second Iteration was approved by the Bankruptcy Court in July 2005. See Revised Sale Mot. (AP docket no. 114, Ex. J), Vol I, Tab L; Revised Sale Order (AP docket no. 114, Ex. K), Vol. I, Tab M.

### 3.    The Last Iteration

Sunset proved unable to close its acquisition of US Mills and further discussions ensued. On November 3, 2005, Fund LLC filed a motion (AP docket no. 114, Ex. L) to approve final revised terms ("Last Iteration"), which were approved by the Bankruptcy Court on November 9, 2005 (AP docket no. 114, Ex. N). See Further Rev. Sale Mot., Vol. I, Tab N; Last Iteration Order, Vol. I, Tab O.

In the Last Iteration, Fund LLC provided $11 million of seller financing to Susnet, in exchange for (i) a $1 million secured subordinated note issued by US Mills and Sunset, (ii) a $5 million secured subordinated note issued by US Mills and Sunset, (iii) a $5 million secured debenture issued by Sunset and convertible into Sunset common stock. Fund LLC's seller financing was secured principally by (i) a second lien against substantially all of US Mills' assets and (ii) a lien against substantially all of Sunset's assets, including a pledge of US Mills' stock.

Fund LLC also received, among other things, third-party credit enhancements from Sunset's parent, Sunset Holdings International, Ltd. ("Holdings") and Sunset's principal Todd Sanders ("Sanders"). See Holdings Put (AP docket no. 115, Ex. R), Vol. I, Tab P; Sanders Put (AP docket no. 114, Ex. O), Vol. I, Tab Q; Sanders Sub-Guaranty (AP docket no. 115, Ex. S), Vol. I, Tab R; Sanders Escrow Guaranty (AP docket no. 115, Ex. T), Vol. I, Tab S.[2]

---

[2]    The Last Iteration did not have an earnest money forfeiture if the Last Iteration failed to close. The $1 million forfeiture under the First Iteration was final once that First Iteration did not close. Moore fabricated his assertion that Sanders told Moore that he had borrowed $1 million from a shadowy,
(continued...)

Another credit enhancement provided by Sunset, and required by the ICA Trustee before he would proceed with the Last Iteration, was the Chadmoore Put.  See Chadmoore Put, Vol. I, Tab B; Oct. 21, 2005 S. Mansour E-mail re: Collateral Security (AP docket no. 115, Ex. U), Vol. I, Tab T.[3]  Sunset arranged for the Chadmoore Put as additional credit support for the lowest tranche of seller financing, the $5 million debenture.  Chadmoore was a Colorado corporation with its principal place of business in Las Vegas, Nevada.

E.     **The Chadmoore Put**

By its terms, the Chadmoore Put obligated Chadmoore to purchase $2.5 million of the $5 million debenture from Fund LLC one year after closing, on November 6, 2006, if the debenture was substantially unpaid on such date.  The Chadmoore Put contained representations and warranties including that: (a) the execution of the Chadmoore Put was "duly and validly authorized by all necessary actions on the part of Chadmoore"; (b) such execution did not "conflict" with Chadmoore's corporate governance provisions or other applicable law and regulations; (c) no other actions were necessary by Chadmoore respecting the Chadmoore Put;

---

non-traditional lender and that if the US Mills sale failed to close yet again, he would lose the $1 million and be at risk of severe physical harm or death.  See App. Br. at 7.  According to Moore, this is his entire reason for issuing the Chadmoore Put that he says he never intended to be enforceable.  Not only is there no support for that statement in Moore's brief (indeed, Moore's Statement of Facts is essentially void of record cites), but Moore's statement is belied by the fact that the $1 million that Moore said that Sanders would lose if the US Mills deal did not close had already been lost by Sunset when it failed to close the First Iteration, and the money was already turned over to the ICA Trustee.  Further, the terms of the operative loan agreements that Sunset signed at the closing of the Last Iteration prevented Sanders from withdrawing funds from Sunset.  In other words, Moore's execution of the Chadmoore Put would not have assisted Sanders in repaying the alleged $1 million that he had allegedly borrowed from non-traditional third-party lenders.

[3]    The Oct. 21, 2005 E-mail stated that "in response to [the ICA Trustee's] clear message Sunset would need to provide tangible collateral to secure the guaranty of the $5MM convertible debenture [Fund LLC] is considering carrying[.]"Oct. 21, 2005 S. Mansour E-mail re: Collateral Security (AP docket no. 115, Ex. U), Vol. I, Tab T.

and (d) there were no threatened or pending actions against Chadmoore that would impact the Chadmoore Put.  See Chadmoore Put at pp. 1–2, Vol. I, Tab B.

The Chadmoore Put also contains a covenant that Chadmoore would "[a]t all times prior to the termination of this Agreement…, maintain cash and cash equivalents in an aggregate amount equal to not less than 110% of the aggregate amount necessary to fund its obligations [t]hereunder."  Chadmoore Put at ¶¶ 2(h) & 5, Vol. I, Tab B.  The Chadmoore Put was not drafted by Fund LLC's counsel.  See Nov. 1, 2005 E-mail with Redline (AP docket no. 115, Ex. FF), Vol. I, Tab U.  The original draft of the Chadmoore Put did not contain the representations and warranties or the cash coverage covenant; they were inserted into the Chadmoore Put at the insistence of Fund LLC.  See id.

## F.   Moore's Execution of the Chadmoore Put

Chadmoore is a Colorado corporation being dissolved under Colorado law.  See Moore Am. Answ. (AP docket no. 80) at ¶¶ 7, 13 & 22, Vol. I, Tab V.  Since at least January 1, 2005, Chadmoore had only two officers — Moore and Stephen Radusch ("Radusch") (Chadmoore's CFO), a former defendant in the Adversary Proceeding.  See Chadmoore Am. Answ. (AP docket no. 83) at ¶¶ 206 & 208, Vol. I, Tab W.  Radusch was also the Chief Financial Officer of Sunset.  Moore was President, Chief Executive Officer, and a Director of Chadmoore.[4]  The "Moore" in Chadmoore is him.  Moore was also a Director of Sunset and a Director of Holdings.  At all relevant times, Moore held Chadmoore common stock and/or options to purchase Chadmoore common stock.  He also held shares of Sunset.  See Moore Am. Answ. at ¶¶ 13, 22, 59 & 71, Vol. I, Tab V; Chadmoore Nov. 2006 Form 8-K at p. 2, Vol. I, Tab X.

---

[4]   On November 10, 2006, Moore was forced to resign from his officer and director positions at Chadmoore.  See Chadmoore Nov. 2006 Form 8-K (AP docket no. 115, Ex. X) at p. 2, Vol. I, Tab X.

When Moore executed the Chadmoore Put he inserted, by hand, the term "President" on the title line of the Chadmoore Put. <u>See</u> Chadmoore Put at p. 6, Vol. I, Tab B. Moore admits that he executed the Chadmoore Put intending that it would **<u>not</u>** be enforceable. <u>See</u> Moore Am. Answ. at ¶¶ 13, 22, 71, 72, 79, 80 & 83, Vol. I, Tab V. Moore admits that he did not disclose the Chadmoore Put to the other members of the Board of Directors and he did not have actual authority to execute it, contrary to his representations and warranties in the Chadmoore Put. <u>See</u> Chadmoore Am. Answ. at ¶¶ 217, 218 & 223, Vol. I, Tab W; Chadmoore Nov. 2006 Form 8-K at p. 4, Vol. I, Tab X; Moore Am. Answ. at ¶¶ 9 & 93, Vol. I, Tab V.

Moore claims to have had only one telephone conversation with a representative of Fund LLC. <u>See</u> Moore Am. Answ. at ¶¶ 80 & 81, Vol. I, Tab V; Nov. 1, 2005 E-mail from Moore to H. Levey (AP docket no. 115, Ex. Z), Vol. I, Tab Y; <u>see also</u> App. Br. at 8. That conversation in no way discussed or even hinted that anyone considered the Chadmoore Put unenforceable. To the contrary, that communication was to confirm that Chadmoore had sufficient cash and cash equivalents to fulfill its obligations under the Chadmoore Put. <u>See</u> Nov. 1, 2005 E-mail from Moore to H. Levey, Vol. I, Tab Y.

**G.    <u>Chadmoore's Refusal to Honor the Chadmoore Put</u>**

On October 16, 2006, Chadmoore made a distribution to shareholders in the aggregate amount of $12,250,000. Moore, a director of Chadmoore, approved the distribution. That was only a few weeks prior to November 6, 2006 – the date on which the Chadmoore Put matured by its terms, obligating Chadmoore to purchase from Fund LLC $2.5 million of the $5 million debenture. Fund LLC learned of the distribution only after it was completed. The distribution left Chadmoore with insufficient assets to honor the Chadmoore Put. <u>See</u> Chadmoore Put at p. 1, ¶ 1 & p. 3, ¶¶ 2(h) & 5, Vol. I, Tab B; Moore Am. Answ. at ¶¶ 8 & 24, Vol. I, Tab V; Chadmoore Oct. 2006 Form 8-K (AP docket no. 115, Ex. AA) at p. 1, Vol. I, Tab Z; Chadmoore Nov. 2006

8-K at p. 6, Vol. I, Tab X. Moore personally received $423,535.50 from the October 2006 distribution on account of his stock and/or options. Moore Am. Answ. at ¶¶ 26, Vol. I, Tab V.

After the Chadmoore Put matured on November 6, 2006, Fund LLC made demand for payment on Chadmoore. Chadmoore refused to perform and claimed in its subsequent Form 8-K that its other two directors (not Moore) had no prior knowledge of the Chadmoore Put. <u>See</u> Chadmoore Nov. 2006 Form 8-K at p. 4 Vol. I, Tab X.

## H.    <u>Fund LLC's Complaint</u>

On February 14, 2007, Fund LLC filed a complaint ("<u>Complaint</u>") commencing this Adversary Proceeding against Chadmoore, Moore and Radusch. The lawsuit sought to enforce the Chadmoore Put. It also included claims against Moore (Count VI) for breach of the implied warranty of authority, breach of the Colorado personal liability statute and fraud arising out of his execution of the Chadmoore Put.[5] In addition, the Complaint asserted claims against Moore and Radusch relating to the $12.25 million shareholder distribution by Chadmoore in October 2006 that rendered it unable to perform under the Chadmoore Put. Fund LLC also asserted claims against Moore and Radusch (a) for orchestrating the improper shareholder distribution and (b) to recover the $423,535.50 received by Moore and $51,785.01 received by Radusch, on account of their Chadmoore stock or options.

---

[5]    Moore completely mischaracterizes the nature of the claims asserted against him to serve his own purposes. In seeking to avoid bankruptcy court jurisdiction, he erroneously asserts that the claims against him "have no connection with the disposition of US Mills" and are instead "state law claims for breach of fiduciary duty by reason of his role in causing Chadmoore to effectuate an alleged improper distribution." App. Br. at 10. No mention is made of the claims asserted against him for executing the Chadmoore Put without authority as part of the sale of US Mills presented to the Bankruptcy Court for approval (Count VI). By contrast, later, when challenging the preliminary injunction entered against him as an order of attachment, Moore reverses course and drops his reference to the claim against him as one for making an unlawful shareholder distribution, instead describing Fund LLC's complaint as a lawsuit to enforce the terms of the Chadmoore Put. App. Br. at 35.

I.    **Preliminary Motion Practice**

On February 14, 2007, Fund LLC filed a motion for a preliminary injunction (the "PI
Motion") (AP docket no. 2).  See Vol. II, Tab AA.  Moore (AP docket no. 14) and Radusch (AP
docket no. 13) opposed the PI Motion.  See Vol. II, Tab BB & CC, respectively.  On March 1,
2007, Radusch filed multiple motions to dismiss the Complaint asserting, in one, that the
Bankruptcy Court lacked subject matter jurisdiction (AP docket no. 10) (Vol. II, Tab DD)
because post-confirmation jurisdiction was narrow and the claims against him were based on state
law theories that do not belong in bankruptcy court.  Additionally, on March 16, 2007, Moore
filed a motion to dismiss (AP docket no. 23) the Complaint, which challenged the legal
sufficiency of the claims pleaded in the Complaint under Fed. R. Bank. P. 7012(h) and Fed. R.
Civ. P. 12(b)(6) but did not challenge jurisdiction.  See Vol. II, Tab EE.

On April 23, 2007, an evidentiary hearing was held to address Moore's and Radusch's
motions to dismiss and the PI Motion.  When Moore's counsel addressed the Court he did not
challenge and, in fact, recognized the Bankruptcy Court's jurisdiction, see April 23 Hrg. Tr. (AP
docket no. 61) at p. 35, lns. 23-25 & p. 36, lns. 6-9, Vol. III, Tab A, consistent with the admission
of jurisdiction in Moore's Answer.  See Moore Answ. at ¶ 12, Vol. II, Tab FF.[6]   At the
conclusion of the hearing, the Bankruptcy Court determined that it clearly had subject matter
jurisdiction, denied the motions to dismiss and granted the PI Motion.  The PI Order was entered
on April 26, 2007.  See PI Order, Vol. I, Tab G.

It was only after the Bankruptcy Court entered the PI Order and denied Moore's motion to
dismiss and Fund LLC initiated contempt proceedings that Moore reversed his position and filed

---

[6]    At the April 23 hearing, Moore's counsel stated "I know what chutzpa is.  Mr. Moore has not
challenged the jurisdiction of this Court in its papers, contrary to what I thought Mr. Steinberg said ….
Certainly there is no question that Your Honor has jurisdiction to proceed with the motion before the
Court[.]"  April 23 Hrg. Tr. at p. 35, lns. 23-25 & p. 36, lns. 1-9, Vol. III, Tab A.

a new motion to dismiss the Complaint for lack of subject matter jurisdiction (AP docket no. 67) on May 18, 2007.  See Vol. II, Tab GG.  Moore's motion repeated the jurisdictional arguments raised in Radusch's motion to dismiss previously denied by the Bankruptcy Court.  See April 23 Hrg. Tr. at pp. 5-7, Vol. III, Tab A; see also May 24, 2007 Hrg. Tr. (AP docket no. 113) at p. 47, lns. 6-17, Vol. III, Tab B.

**J.    The Preliminary Injunction**

The PI Order, inter alia, (a) required Moore and Radusch to deposit their improper shareholder distributions from October 2006 ($423,535.50 and $51,785.01, respectively) into escrow with their counsel of record no later than May 7, 2007 (preserving the status quo while the parties litigated Fund LLC's claims to recover the shareholder distributions as fraudulent transfers and/or illegal dividends); (b) required Moore's and Radusch's counsel to file a notice on May 8, 2007, certifying that the escrow deposits were received; and (c) required Moore and Radusch to provide, no later than May 7, 2007, a detailed accounting of (i) their assets, and (ii) any transfers of property on or after November 1, 2005, greater than $2,500.  See PI Order, Vol. I, Tab G.

On May 8, 2007, Moore's counsel filed a notice (the "Moore Notice") (AP docket no. 56) stating that Moore had not posted any of his escrow of $423,535.50.[7]  See Moore Notice, Vol. II, Tab HH.  Moore also submitted a partial and incomplete accounting of his assets and transfers.

**K.    Moore's Failure to Comply with the PI Order**

Moore admits he failed to post any of his required escrow of $423,535.50 by May 7, 2007.  See Moore Notice, Vol. II, Tab HH.  Nor has he paid any of it since.  Moore's counsel said

---

[7]    Between the time of the hearing on the preliminary injunction and May 8, 2007, Moore spent money, including paying $60,000  to his counsel.  See Supp. Acct., Ex. A at p. 6, to Sept. 18 Hrg. Tr., Vol. IV, Tab C.

nothing about Moore being unable to comply with the PI Order at the April 23 hearing or when Fund LLC asked for comments on the form of the PI Order.  Furthermore, Moore's initial accounting did not satisfy the requirements of the PI Order.

**L.**    **The Contempt Orders and Moore's Continued Non-Compliance**

As a result of Moore's failure to post any of his escrow or make his required disclosures, Fund LLC filed an application (AP docket no. 57) on May 14, 2007, seeking to hold Moore in contempt of the PI Order.  See Contempt App., Vol. II, Tab II.  The Bankruptcy Court conducted an evidentiary hearing on May 24, 2007 and, on May 30, 2007, entered its first (the "First Contempt Order") (AP docket no. 81) (Vol. II, Tab JJ) in a series of contempt orders against Moore.  The First Contempt Order determined that Moore was in contempt of the PI Order. Based on the evidence presented (which will be described in greater detail below in Section VI) that Moore was affirmatively trying to conceal or shelter assets, the First Contempt Order also prohibited Moore and certain of his transferees from making further transfers of assets without court approval.  The matter of sanctions was adjourned to August 9, 2007 (and ultimately to September 18, 2007) to give Moore additional opportunities to comply.[8]

Moore squandered those chances and never posted his escrow or made the complete disclosures required.  Fund LLC and Moore engaged in written correspondence in an effort to resolve Moore's contempt but he never did bring himself into compliance.  On September 11, 2007, Fund LLC filed a statement (AP docket no. 168) describing Moore's continued non-compliance with the Bankruptcy Court's orders and requesting, among other things, coercive sanctions against Moore.  See Further Contempt Stmt., Vol. II, Tab KK.  The Bankruptcy Court

---

[8]    On June 7, 2007, Moore moved for additional time to seek reconsideration of the Contempt Order. The Bankruptcy Court granted the request for more time on June 8, 2007.  On June 28, 2007, Moore moved to modify the First Contempt Order and by order (AP docket no. 155) dated July 19, 2007 the Bankruptcy Court declined to modify the First Contempt Order.

conducted a further evidentiary hearing on September 18, 2007 and, that same day, entered the Further Contempt Order (AP docket no. 172) ("<u>Second Contempt Order</u>") finding Moore in Contempt of the PI Order and the First Contempt Order and imposing a civil penalty of $500 a day until he brought himself into compliance.  <u>See</u> Second Contempt Order at ¶ 7, p. 6, Vol. II, Tab LL.

At the next hearing on October 2, 2007, the Bankruptcy Court determined that Moore was still in material breach of the PI Order, First Contempt Order and Second Contempt Order. Accordingly, the Bankruptcy Court entered the Third Contempt Order (AP docket no. 182) ("<u>Third Contempt Order</u>") and quantified the $500 per day fine to a sum certain judgment (AP docket no. 185) ("<u>Contempt Judgment</u>") for the period between the September 18 hearing and October 2, 2007 ($7,000), such Contempt Judgment being one of the judgments currently being appealed.  <u>See</u> Third Contempt Order, Vol. II, Tab MM; Contempt Judgment, Vol. I, Tab C.[9]

Additionally, on October 3, 2007, pursuant to paragraph 8 of the Second Contempt Order, the Bankruptcy Court awarded Fund LLC fees and costs in the total amount of $34,680.70 in connection with its preparation and prosecution of Moore's continued contempt of the PI Order and subsequent contempt orders.  This order became a judgment (AP docket no. 191) ("<u>Fee Judgment</u>") against Moore on October 18, 2007; such Fee Judgment being one of the judgments currently being appealed.  <u>See</u> Fee Judgment, Vol. I, Tab E.

**M.    <u>Summary Judgment</u>**

On June 13, 2007, Fund LLC moved for summary judgment against Moore on Count VI of the Complaint, seeking to hold him liable for execution of the Chadmoore Put under a number of different legal theories.   Moore cross-moved for summary judgment against Fund LLC,

---

[9]    As of filing of this Brief, Moore is still not in compliance with the escrow posting requirement or his reporting requirements and the $500/day penalty continues to accrue.

seeking dismissal of all the claims asserted against him.  Subsequently, Fund LLC cross-moved for summary judgment against Moore on all of the remaining counts asserted against him.

On October 3, 2007, the Bankruptcy Court entered its memorandum decision (the "Mem. Dec.") (AP docket no. 184) with respect to Fund LLC's and Moore's summary judgment motions.  The Bankruptcy Court held that it had subject matter jurisdiction over the dispute pursuant to the July 8, 2004 referral order in the SEC Action and because the Adversary Proceeding was a proceeding "arising in" a case under title 11.  Mem. Dec. at 8, Vol. I, Tab A. The Bankruptcy Court granted summary judgment in favor of Fund LLC on Count VI of the Complaint.  In so doing, the Court addressed the three alternative bases Fund LLC had asserted for obtaining summary judgment on Count VI: breach of the implied warranty of authority under New York law, statutory liability under Colorado's personal liability statute, C.R.S. § 7-102-104, and common law fraud. Mem. Dec. at 10-15, Vol. I, Tab A.  The Bankruptcy Court granted Fund LLC's motion for summary judgment on its implied warranty of authority claim, granted Moore's cross-motion for summary judgment on the Colorado personal liability statute, and denied Fund LLC's and Moore's motions for summary judgment on the fraud claim.  Mem. Dec. at 10-15, Vol. I, Tab A.  On October 9, 2007, the Bankruptcy Court subsequently entered the Amended Order Granting Final Judgment (AP docket no. 187) (Vol. II, Tab NN) and the Final Judgment. The Final Judgment provided for a total award of $1,816,462.09, plus such post-judgment interest as may accrue until full satisfaction.

## ARGUMENT

I.    **THE BANKRUPTCY COURT RULED THAT IT HAD SUBJECT MATTER JURISDICTION OVER THIS ADVERSARY PROCEEDING BEFORE IT DECIDED THE SUMMARY JUDGMENT MOTIONS**

Moore argues that the Bankruptcy Court erred by granting Fund LLC's motion for summary judgment without first resolving the issue of whether it had subject matter jurisdiction over this Adversary Proceeding.  App. Br. at 13-14.  Moore is wrong.[10]

The Bankruptcy Court held that it had subject matter jurisdiction over this Adversary Proceeding months before it even considered the parties' summary judgment motions, a point that Moore concedes.  App. Br. at 11.  In April 2007, Moore's co-defendant, Radusch, filed several motions to dismiss, one of which sought dismissal of the Complaint for lack of subject matter jurisdiction.  See Vol. II, Tab DD.  Moore filed his motion to dismiss (Moore Mot. Dismiss, Vol. II, Tab EE) but did not challenge jurisdiction and, in his Answer, admitted that there was subject matter jurisdiction.  Moore Answ. at ¶ 12, Vol. II, Tab FF.  On April 23, 2007, the Bankruptcy Court denied the motions to dismiss and found that it had jurisdiction:

> Well, clearly this Court finds that it has both personal and subject matter jurisdiction for various reasons, which I don't need to state with any particularity….  This Court has subject matter jurisdiction pursuant to the Order of July 8, 2004, in the SEC enforcement action referring jurisdiction over all matters involving Fund LLC's assets to this Court.  That action is ongoing and is not dependent or affected by the confirmation of the Liquidating Plan in the bankruptcy cases.  And also there is an adversary proceeding arising in a case under title 11 U.S. [sic], 28 U.S.C. § 1334(b).

April 23 Hrg. Tr. at p. 33, lines 3-16, Vol. III, Tab A.[11]

---

[10]    Moore's argument that the Bankruptcy Court never ruled that it had subject matter jurisdiction is inconsistent with his own Statement of the Issues, wherein he states that the second issue for this Appeal is "Whether the Bankruptcy Court erred in holding that it has jurisdiction over the subject matter of this adversary proceeding without addressing the arguments advanced by Moore in his motion to dismiss for lack of subject matter jurisdiction."  App. Br. at 2.

[11]    Prior to settling with Fund LLC, Radusch was a named defendant in Counts V, IX, X, XI and XIII of the Complaint.  Moore is a named defendant in Counts V, VI, IX, X, XI and XIII.  The Bankruptcy

(continued...)

Moore's counsel declined to argue the jurisdictional question at the April 23 hearing and, consistent with the admission of jurisdiction in his Answer, conceded that the Bankruptcy Court could exercise subject matter jurisdiction over this lawsuit.  See April 23 Hrg. Tr. at p. 35, lns. 24-25, & p. 36, lns. 6-8, Vol. III, Tab A ("Mr. Moore has not challenged the jurisdiction of this Court in its papers ….  Certainly there is no question that Your Honor has jurisdiction to proceed with the [PI Motion] before the Court[.]")  It was only later – after Moore admitted his failure to comply with the PI Order and Fund LLC filed its application seeking to hold Moore in contempt for such failure – that Moore reversed his position and filed his second motion to dismiss repeating the same jurisdictional arguments raised by Radusch and rejected by the Bankruptcy Court on April 23.  Moore filed that motion on May 18, 2007, six days before the contempt hearing on May 24, 2007, in an obvious attempt to forestall the contempt proceedings.

Moore later incorporated by reference the same arguments into his summary judgment papers.  The Bankruptcy Court gave his rehashed jurisdictional arguments due consideration and rejected them as part of its ruling on summary judgment.  Specifically, in the section of the decision entitled "Jurisdiction," the Bankruptcy Court expressly found that it had jurisdiction both by referral from the SEC Enforcement Action and as a matter "arising in" the Chapter 11 Cases.  See Mem. Dec. at 8, Vol. I, Tab A.[12]

---

Court determined that it had jurisdiction over Fund LLC's claims against Radusch.  There is only one claim, Count VI, asserted against Moore and not Radusch.  That claim is based upon Moore's deception and wrongful conduct when he signed the Chadmoore Put without authority and represented that he had all required approvals.  That undeniably goes to whether the Bankruptcy Court was deceived in connection with the court-approved sale of US Mills.

[12]   Moore misconstrues a footnote (n. 7) in the Memorandum Decision to suggest that the Bankruptcy Court gave no consideration to his jurisdictional arguments.  App. Br. at 13-14.  The footnote merely observed as a procedural matter that, up until its decision where the Bankruptcy Court reiterated that it had adequate jurisdiction, a hearing on the issues raised in Moore's motion to dismiss (and incorporated by reference into his summary judgment papers) had been adjourned.  Contrary to Moore's argument (App. Br. at 14), the Bankruptcy Court did not defer its decision of whether it had
(continued...)

II.     **EVEN IF THE BANKRUPTCY COURT HAD FAILED TO CONSIDER
        WHETHER IT HAD SUBJECT MATTER JURISDICTION OVER THE
        ADVERSARY PROCEEDING BEFORE IT DECIDED THE SUMMARY
        <u>JUDGMENT MOTIONS, REVERSAL WOULD NOT BE WARRANTED</u>**

Even assuming for the sake of argument that the Bankruptcy Court did not address the
challenge to its jurisdiction – which is <u>not</u> the case – any such failure would not warrant reversal
because the Bankruptcy Court clearly had subject matter jurisdiction over the lawsuit.  <u>Liberian
Int'l Ship & Corp. Registry, LLC v. Allfirst Bank (In re Millenium Seacarriers, Inc.)</u>, Case
No. 02-7108, 2004 WL 63501, *4 (S.D.N.Y. Jan. 14, 2005) (holding that the bankruptcy court
should have ruled on jurisdictional challenge prior to making other substantive rulings but
declining to reverse and remand because the bankruptcy court clearly had subject matter
jurisdiction).

The Bankruptcy Court had subject matter jurisdiction over this Adversary Proceeding on
the following independent bases:  (i) under 28 U.S.C. § 1334(b), as a lawsuit (1)"arising in" or
(2) at a minimum "related to" the Chapter 11 Cases; (ii) independent of any statutory grant of
jurisdiction, the Bankruptcy Court retained sufficient inherent or ancillary jurisdiction to interpret
and enforce its orders approving the sale of US Mills ("<u>Sale Orders</u>"); (iii) Fund LLC's claims
against Moore fall under the jurisdiction delegated to it by this Court in the SEC Enforcement
Action, and (iv) the Plan and Sale Orders reserved jurisdiction for the Bankruptcy Court to
address Fund LLC's claims.

---

jurisdiction until after it exercised that jurisdiction to rule on summary judgment, and Moore cites
nothing in the record suggesting in any way that the Court intended to defer its ruling on jurisdiction.

A.    **The Bankruptcy Court Has Jurisdiction Over This Lawsuit
      As A Matter "Arising In" The Debtors' Chapter 11 Cases**

The Bankruptcy Court properly exercised its statutory grant of subject matter jurisdiction

over this lawsuit as a matter "arising in" the Chapter 11 Cases.[13]

Moore contends (App. Br. at 16) that, as a general proposition, there can never be "arising

in" jurisdiction after a plan is confirmed because the debtor's estate no longer exists, but that is

not the law.  See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223,

230-31 (2d Cir. 2002) (affirming post-confirmation exercise of "core" jurisdiction over lawsuit by

purchaser and assignee of lease to enforce provisions in plan and sale order barring lessor from

asserting claims against them for additional rent); Geruschat v. Ernst Young LLP (In re Seven

Fields Dev. Corp.), 505 F.3d 237, 260 (3d Cir. Oct. 24, 2007) (affirming bankruptcy court's post-

confirmation exercise of "arising in" jurisdiction).   Confirmation does not alter the basic

jurisdictional analysis of whether, for purposes of 28 U.S.C. § 1334(b), a lawsuit "arises under"

title 11 or "arises in" or is "related to" a case under title 11.   Nachom v. Citigroup, Inc. (In re

Global Crossing, Ltd., Securities Lit.), Case No. 02-910, 2003 WL 22705127 (S.D.N.Y. Nov. 14,

2003) ("[B]ankruptcy jurisdiction is not cut off the moment a plan of reorganization is confirmed,

nor is the analysis under § 1334 … modified."); see also 8 Collier on Bankruptcy ¶ 1142.04[1]

(15th ed. rev.) ("Bankruptcy jurisdiction is governed by 28 U.S.C. § 1334; this is so whether the

matter at issue arises before or after confirmation of a plan.").

Moore further argues that, in this instance, there is no "arising in" jurisdiction because

Fund LLC's claims are "independent of a core bankruptcy function."  App. Br. at 20.  That is also

---

[13]   The Judicial Code confers original jurisdiction on the district courts over all civil proceedings "arising
under title 11 or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  The district courts
are authorized to refer such matters to the bankruptcy courts, 28 U.S.C. § 157(a), which are "units" of
the district courts, 28 U.S.C. § 151.

not correct. Fund LLC's claim that it was deceived by Moore in connection with the sale of US

Mills is in no way "independent" of the approval of that sale post-confirmation by the Bankruptcy

Court.[14] When it obtained final approval of the sale, Fund LLC advised the Bankruptcy Court

that the Chadmoore Put was an integral part of the transaction.[15] The Bankruptcy Court approved

the transaction and Fund LLC closed oblivious to the fact that the Chadmoore Put was not

properly authorized.[16] Moore's deception caused the sale to be approved on false pretenses –

namely, that an integral part of the transaction, the Chadmoore Put, was not properly authorized

and potentially unenforceable – and, thus, implicates the very integrity of the bankruptcy process.

See Seven Fields Dev. Corp., 505 F.3d at 260 (affirming post-confirmation exercise of "arising

in" jurisdiction over creditors' malpractice claims against debtors' accountants in chapter 11 case

on grounds that the malpractice impugned "the integrity of the bankruptcy process"). A sine qua

non of bankruptcy is that there be no fraud or other misconduct underlying a court-approved sale.

A bankruptcy court undeniably has authority to address whether a sale that it blessed was tainted

---

[14] Moore does not dispute that approval of the sale was a proper exercise of the Bankruptcy Court's post-confirmation jurisdiction.

[15] See Further Rev. Sale Mot. at ¶¶ 18-19, Vol. I, Tab N ("Fund LLC will also have the ability to "put" up to $2.5 million of the $5 million convertible debenture to a third party arranged by Sunset. The convertible debenture is the last tranche of the debt obligations [i.e., seller financing] owed to Fund LLC; thus, the most junior debt piece is protected by third party collateral …. The aforesaid $2.5 million 'put' is to give the ICA Trustee assurances that this type of refinancing [Sunset was representing that it would do a debt offering to retire the debenture within six months of closing] will occur in a relatively short time.").

[16] Moore's assertion that the lawsuit has "no connection" at all with the sale of US Mills (App. Br. at 10) is disingenuous. Fund LLC's principal claim (Count VI) is that Moore signed the Chadmoore Put without authority and falsely warranted and represented that he had all required approvals. The Chadmoore Put was an integral part of the sale. Fund LLC's additional claims relate to Moore's actions after the sale closed – namely, that he breached his fiduciary duty by failing to cause Chadmoore to comply with the requirement in the Chadmoore Put that it maintain a 110% reserve against its exposure to Fund LLC (Count V); that Moore is liable as a director for orchestrating the improper shareholder distribution in October 2006 that left Chadmoore unable to pay Fund LLC (Count IX); and that Moore is liable for his share ($423,535.50) of that distribution as a shareholder of Chadmoore (Counts X, XI). Those additional claims involve the same operative facts, allege a continuation of the same scheme, and are inextricably intertwined with the principal claim.

by fraud or other misconduct.  Fund LLC's claims against Moore all stem from the fact that it was deceived by Moore in connection with a court-approved sale and, thus, all "arise in" the chapter 11 case in which that sale was approved.[17]

Lastly, Moore argues (App. Br. at 16, 18) that jurisdiction should be construed more narrowly because this was a liquidating chapter 11 case.  That is not the law, especially after a plan is confirmed.[18]  Quite the opposite, courts find more expansive post-confirmation jurisdiction in a liquidating chapter 11 case because the debtor is winding up, there is no prospect of unending bankruptcy jurisdiction, and any litigation involving the debtor thus relates much more directly to the chapter 11 scheme.  Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.), 410 F.3d 100 (1st Cir. 2005); Penthouse Media Group v. Guccione (In re General Media, Inc.), 335 B.R. 66, 74 at n.7 (Bankr. S.D.N.Y. 2005)).

---

[17]   Moore initially admitted that the Bankruptcy Court had subject matter jurisdiction over Fund LLC's claims.  April 23 Hrg. Tr. at p. 35, lns. 23-25 & p. 36, lns. 6-9, Vol. III, Tab A; Moore Answ. at ¶ 12, Vol. II, Tab FF.  Whether or not that admission itself was binding, Moore also admits facts sufficient to determine summarily that there was subject matter jurisdiction.  See Ferguson v. Neighborhood Housing Servs., 780 F.2d 549, 551 (6th Cir. 1986) ("[P]arties may admit the existence of facts which show jurisdiction, and the courts may act judicially upon such an admission.") (citation omitted); Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd., 411 F. Supp. 2d 458, 465 (S.D.N.Y. 2006).  Specifically, Moore's admits that he signed the Chadmoore Put without authority and hid it from Chadmoore's Board of Directors, of which he was a member See Chadmoore Am. Answ. at ¶¶ 217, 218 & 223, Vol. I, Tab W; Chadmoore Nov. 2006 Form 8-K at p. 4, Vol. I, Tab X; Moore Am. Answ. at ¶¶ 9 & 93, Vol. I, Tab V; and that he issued the Chadmoore Put in connection with the Bankruptcy Court approved sale of US Mills to Sunset.  Indeed, Moore asserts that he believed that he was executing the Chadmoore Put as "window dressing" to be provided to the Bankruptcy Court in connection with the application to that court for approval of the sale of US Mills.

[18]   Moore's reliance (App. Br. at 18) on Celotex Corp. v. Edwards, 514 U.S. 300 (1995) is misplaced.  Celotex had nothing to do with post-confirmation jurisdiction.  There, the debtor lost an appeal filed pre-petition and decided post-petition and the question was whether the bankruptcy court could stay the prevailing creditors' execution on the appellate bond posted by the debtor.  The Supreme Court held that the stay was proper under the bankruptcy court's broad "related to" jurisdiction.  In dicta, in the context of a discussion of why a stay might be more necessary in a reorganization to prevent a run on the debtor's assets and preserve going concern value, the majority observed that bankruptcy jurisdiction "may" extend more broadly in a reorganization under chapter 11 than a liquidation under chapter 7.  Id. at 310.  Ultimately, however, the Supreme Court ruled in favor of more expansive "related to" jurisdiction and endorsed the bankruptcy court's authority.

Here, at the time of the confirmation of the Plan, there were many assets left to be sold and litigation to be brought. The purpose of adopting the Plan at this time was primarily to put a mechanism in place for periodic, interim distributions to creditors. The Plan was not intended to divest the Bankruptcy Court or the District Court of their oversight function relating to the administration of the bankruptcy estate.

**B.      At A Minimum, The Bankruptcy Court Had
          "Related To" Jurisdiction Over This Lawsuit**

The Bankruptcy Court correctly determined that it had "arising in" jurisdiction, which means there is no reason to reach the alternative question of whether, absent that core jurisdiction, it could have exercised non-core "related to" jurisdiction under 28 U.S.C. § 1334(b). Even assuming for the sake of argument that there was no "arising in" jurisdiction, the Court certainly had "related to" jurisdiction over this lawsuit.

In this Circuit, the relevant inquiry for "related to" jurisdiction is whether (i) the outcome of the litigation "might have any conceivable effect" on the bankruptcy estate or (ii) the litigation has a "significant connection" with the bankruptcy case. Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.), 980 F.2d 110, 114 (2d Cir. 1992).[19] Fund LLC's claims, if successful, will increase creditor recoveries. The Debtors' pre-petition creditors – principally,

---

[19]   Moore argues that, in order to exercise jurisdiction over this post-confirmation lawsuit, the Bankruptcy Court had to both (i) identify a "close nexus" between the lawsuit and the bankruptcy case and (ii) determine that the plan reserved adequate jurisdiction for it to address the lawsuit. App. Br. at 18. That is not the law. That test, known as the "close nexus" test, applies (if at all) only to questions of "related to" and not "arising in" jurisdiction. Seven Fields Dev. Corp., 505 F.3d at 260. Here, since the Bankruptcy Court properly found that it had "arising in" jurisdiction, Moore's test is superfluous. Moreover, even if the Court was relying solely on its "related to" jurisdiction, the "close nexus" test is not the law of this Circuit. Kassover v. Prism Venture Partners, LLC (In re Kassover), 336 B.R. 74 (Bankr. S.D.N.Y. 2006), the only case cited by Moore, although citing the close nexus test, applied the Second Circuit standards set forth in Cuyahoga Equip. See id. at 80. Lastly, even if the "close nexus" test were applicable here, it would be satisfied. The lawsuit shares a sufficiently close nexus with the Chapter 11 Cases and, specifically, the sale of US Mills approved post-confirmation by the Bankruptcy Court. The Plan also retained adequate jurisdiction to address Fund LLC's claims against Moore (discussed infra at 27-28).

investors who bought debt securities issued by the Funds – exchanged their claims for equity stakes in Fund LLC. Thus, any recovery by Fund LLC will increase the investors' recoveries on their claims. This lawsuit also has a "significant connection" with the Chapter 11 Cases; Fund LLC alleges that it was defrauded by Moore in connection with a court-approved sale that it would not have pursued if it had known of Moore's deception.[20]

## C.     The Bankruptcy Court Had Inherent Or Ancillary Jurisdiction To Interpret And Enforce the Sale Orders

It is well established that, post-confirmation, a bankruptcy court retains jurisdiction to interpret and enforce its orders. Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.), 419 F.3d 83, 97 (2d Cir. 2005). This "inherent" or "ancillary" jurisdiction is "wholly independent of the statutory jurisdiction conferred by 28 U.S.C. § 1334." LTV Corp. v. Back (In re Chateaugay Corp.), 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996), aff'd in relevant part, 213 B.R. 633 (S.D.N.Y. 1997). Thus, even in the absence of "arising in" or "related to" jurisdiction, there was adequate subject matter jurisdiction.

---

[20]   The cases relied on most heavily by Moore, which he says are factually and legally "indistinguishable" (App. Br. at 21), are inapposite. In Grimes v. Graue (In re Haws), 158 B.R. 965 (Bankr. S.D. Tex. 1993), a liquidating trust sued a colleague of the debtor for breaching fiduciary duties arising out of an alleged partnership. The case had been closed but was reopened to permit the lawsuit. The court concluded that it could not exercise "related to" jurisdiction over an effort by creditors to proceed post-bankruptcy against a third party who was never involved in the bankruptcy case. Id. at 970-71. Of note, the court concluded that the lawsuit was not related to the plan and was not seeking to ensure "that the federal bankruptcy laws are complied with in the face of violations." Id. at 971. Here, the Bankruptcy Court is exercising "arising in" not "related to" jurisdiction and the lawsuit seeks to allocate accountability for Moore's misconduct in a court-approved sale. General Media, 335 B.R. 66, is also distinguishable. There, the court concluded that it could not exercise "related to" jurisdiction because the lawsuit was a third-party dispute (the plaintiff, who acquired the debtors' assets for consideration pursuant to a confirmed plan, versus the debtor's former principal), the claims did not arise under or touch on the plan and, notably, any recovery would inure to the plaintiff, not creditors, who exchanged their claims for notes that were later refinanced. By contrast, here, the Bankruptcy Court exercised "arising in" (not "related to") jurisdiction and any recovery will inure to the benefit of the Debtors' creditors.

Here, the Bankruptcy Court unwittingly approved a sale premised on a fraud and Moore's misrepresentations and, thus, is a victim of Moore's deceit along with Fund LLC. Fund LLC is a post-confirmation entity formed to wind-down the Debtors and liquidate their investments for the benefit of creditors. The liquidation is being administered under the joint supervision of the Bankruptcy Court and this Court. Fund LLC is managed by the ICA Trustee, who was appointed by this Court at the request of the SEC and reports to both. The Bankruptcy Court had jurisdiction to consider whether a sale it approved post-confirmation was tarnished by wrongdoing and, if so, to preside over the dispute as to who is accountable.

**D.** **The Bankruptcy Court Properly Determined That Fund LLC's Claims Against Moore Fall Under The Jurisdiction Delegated To It By The District Court As Part Of The SEC Enforcement Action**

The Debtors' chapter 11 cases have unique jurisdictional underpinnings because of the parallel SEC Enforcement Action, which is ongoing and was not affected by confirmation of the Plan. The ICA Trustee was appointed by and reports to this Court. On July 8, 2004, this Court referred jurisdiction over all matters involving the disposition of Fund LLC's assets to the Bankruptcy Court. See July 8, 2004 Referral Order, at ¶ 1, p. 3, Vol. I, Tab H. That referral was made post-confirmation; the Bankruptcy Court confirmed the Plan in August 2003 and this Court approved the Plan in all respects in September 2003.

That delegation of jurisdiction by this Court empowered the Bankruptcy Court to approve Fund LLC's post-confirmation sale of US Mills. As noted above (supra at n.14), Moore does not dispute that the Bankruptcy Court had post-confirmation jurisdiction to approve the sale.

Moore's argument (App. Br. at 25-26) that this Court's referral order is not binding on him because he was not a party and did not receive notice of the order is specious. The referral order was a grant of prospective jurisdiction over the disposition of Fund LLC's assets; in effect, this Court returned jurisdiction over Fund LLC's assets to the Bankruptcy Court. Fund LLC had

no obligation and, as a practical matter, could not have served notice of that referral on parties who thereafter might purchase assets from Fund LLC.  In fact, at the time the referral order was signed in July 2004, Fund LLC had never even heard of Chadmoore.

Moore's other argument is that the referral order does not give the Bankruptcy Court jurisdiction over Fund LLC's claims because they do not constitute "Assets" as the term is defined in the Plan and, even if they did, litigating the claims would not be a "disposition" of Assets.  App. Br. at 26.  Moore misses the point.  The referral order gave the Bankruptcy Court jurisdiction over all "matters respecting the disposition of the Assets transferred to the Liquidating LLCs."  Fund LLC's claims that it was deceived by Moore in a court-approved sale most definitely are in respect of the disposition of an Asset (US Mills) and, thus, squarely fall within the ambit of that jurisdictional referral.[21]

**E.    The Plan And Sale Orders Reserved Sufficient Jurisdiction
For The Bankruptcy Court To Address Fund LLC's Claims**

The Bankruptcy Court's exercise of post-confirmation jurisdiction is particularly appropriate where, as here, the Plan and Sale Orders reserved jurisdiction for it to address the claims in this lawsuit.  Article XIV of the Plan, "Retention of Jurisdiction," provided the original split of post-confirmation jurisdiction between this Court and the Bankruptcy Court.  Section 14.2, "Retention of Jurisdiction by Bankruptcy Court," provided that the Bankruptcy Court had jurisdiction "(c) to hear and determine such litigation as may be commenced by the ICA Trustee in the Bankruptcy Court on or after the Effective Date to collect assets of the Debtors[]" and over

---

[21]    Moore wrongly accuses Fund LLC of "forum shopping" in reliance (App. Br. at 29-30) on proceedings in a wholly-unrelated lawsuit between Fund LLC and Branch Banking & Trust.  This is an outrageous assertion coming from Moore in light of the fact that he did not challenge jurisdiction until after the Bankruptcy Court had denied his motion to dismiss and granted the preliminary injunction against him (see supra at pp. 13, 18).  His belated desire to move this lawsuit from the Bankruptcy Court to this Court reflects that Moore is, in fact, the party "forum shopping," not Fund LLC.

"(h) such other matters as the District Court may refer to the Bankruptcy Court."  There should be no question that Fund LLC's claims against Moore clearly fit within that jurisdictional grant of Plan section 14.2(c) as US Mills and the proceeds thereof including the claims made against Moore in connection with the US Mills sale and the enforcement of Chadmoore Put are "assets" of the Debtors.  Further, pursuant to section 14.1(b) of the Plan, this Court's July 8, 2004 order referred jurisdiction to the Bankruptcy Court over all "matters respecting the disposition of the Assets transferred to each Liquidating LLC."  <u>See</u> July 8, 2004 Referral Order, Vol. I, Tab H. Thus, the Bankruptcy Court was properly vested with post-confirmation jurisdiction over all matters respect the sale of US Mills under Plan section 14.2(h).

Additionally, contrary to Moore's assertions, the Sale Orders themselves reserved jurisdiction for the Bankruptcy Court to entertain Fund LLC's claims against Moore.  The sale went through several iterations and, each time, the Bankruptcy Court reserved jurisdiction over all sale-related matters.  The final Sale Order reserved jurisdiction "with respect to all matters arising from or related to the interpretation, implementation or enforcement of this Order, the Original Approval Order, the July 27 Order, and the transactions contemplated by the Motion." <u>See</u> Last Iteration Order at ¶ 6, p. 3, Vol. I, Tab O.  The Chadmoore Put is one of the transactions contemplated by the Motion (as defined in the Last Iteration Order) and Fund LLC's claims against Moore relate to the implementation and enforcement of the Sale Orders.[22]

---

[22]    Moore argues that the Sale Orders are not binding on him because he was not served and the motion did not identify Chadmoore or Moore by name.  App. Br. at 28.  The fact that Chadmoore and Moore were not named in the Further Rev. Sale Mot. (Vol. I, Tab N) filed in November 2005 (which is the only sale motion of relevance to Chadmoore and Moore based on when they first became involved) is of no consequence.  Fund LLC's disclosures discussed the Chadmoore Put and, for purposes of putting creditors and other parties in interest on notice, that was more than sufficient.  <u>See</u> <u>supra</u> at n.15.  The fact that Moore was not served with the Further Rev. Sale Motion is irrelevant.  The bankruptcy rules require service only on parties in interest in order to give them an opportunity to object to the proposed sale.  Moore does not suggest that, if he had been served, anything would have been different.  Serving a document on Moore (individually or as President of Chadmoore) would not

(continued...)

**III.   THE BANKRUPTCY COURT CORRECTLY GRANTED
SUMMARY JUDGMENT AGAINST MOORE FOR BREACHING
NEW YORK'S IMPLIED WARRANTY OF AUTHORITY**

The Bankruptcy Court granted summary judgment in Fund LLC's favor on Count VI of the Complaint finding that Moore breached the implied warranty of authority under New York law because, when he executed the Chadmoore Put, he did not act with Chadmoore's authority. Mem. Dec. at 11-14.  In fact, Moore affirmatively states that he signed the Chadmoore Put, with all of its accompanying representations and warranties, intending that it would never be enforceable.  See Moore Am. Answ. at ¶¶ 13, 22, 71, 72, 79, 80 & 83, Vol. I, Tab V.

Moore argues that the Bankruptcy Court's ruling should be reversed for two reasons, neither of which has merit.  First, Moore argues (for the first time on appeal), that reliance is an element of New York's implied warranty of authority and that whether the ICA Trustee and/or Fund LLC's counsel knew or should have known that Moore did not have authority to enter into the Chadmoore Put is an issue of fact.  Second, Moore argues that an agent is only liable under an implied warranty of authority where the principal would be bound if the agent had acted with authority and, since the Chadmoore Put is allegedly unenforceable against Chadmoore, it was improper for the Bankruptcy Court to grant summary judgment on Fund LLC's implied warranty of authority claim.

**A.   Moore's Reliance Argument Is Erroneous**

Relying on the Restatement (Third) of Agency § 6.10, Moore concocts a flawed argument for the first time on appeal that: (a) because the ICA Trustee and/or Fund LLC's counsel knew that Chadmoore was dissolved, it somehow automatically meant that Chadmoore could not enter

---

have prevented his fraud.  He knew the terms of sale both as the principal officer and director of Chadmoore and as a director of the purchaser, Sunset.  In fact, he signed documents for Sunset as part of the transaction.  See Secretary's and Incumbency Certificate at p. 5, Vol. I, Tab OO.  He was a proponent of the sale.

into the Chadmoore Put; and (b) Fund LLC should have known of that alleged result and therefore Fund LLC could not have reasonably relied upon Moore's warranty of authority. App. Br. at 30.

### 1.    <u>Moore Waived His Reliance Argument By Not Raising It Below</u>

As an initial matter, Moore did not make this argument to the Bankruptcy Court and therefore, under Second Circuit law, it is deemed waived on appeal.  See <u>Ramsameachire v. Ashcroft</u>, 357 F.3d 169, 182 n.4 (2d Cir. 2004); <u>Anthony v. City of New York</u>, 339 F.3d 129, 136 n.3 (2d Cir. 2003) (argument "deemed waived, as it was never raised before the district court").[23]

### 2.    <u>Reliance Is Not A Defense To An Implied Warranty Of Authority Claim</u>

Even if Moore's reliance argument was properly raised on appeal, it is contrary to New York law, which governs this dispute.  Under New York law, Moore is personally liable to Fund LLC for the Chadmoore Put regardless of whether Fund LLC justifiably relied on Moore's representations.  The New York cases make clear that lack of justifiable reliance is not a defense to a claim for a breach of the implied warranty of authority because an implied warranty of authority claim is not based on allegations of fraud or deceit, but on contract.  See <u>Christman v. Maristella Compania Naviera</u>, 293 F. Supp. 442, 444 (S.D.N.Y. 1968) ("We reject third-party defendant's argument that recovery for an agent's misrepresentation of his authority is founded on the tort of deceit ....  [W]hen an agent signs a contract he impliedly warrants that he has authority to make the contract .... [T]his warranty arises from the contract."); <u>Cargo Ships El Yam, Ltd. v. Stearns & Foster Co.</u>, 149 F. Supp. 754, 762 (S.D.N.Y. 1955) (holding shipping company liable for breach of its warranty of authority because it signed the agreement as an agent

---

[23]    Moore argued below that Fund LLC's implied warranty of authority claim is barred based on the <u>in pari delicto</u> doctrine.  See Moore Opp. to Fund LLC Part. Sm. Judg. at p. 13, Vol. II, Tab PP.  Moore has not raised that erroneous argument in this appeal.

for another company and was not authorized to do so even though it had not acted with intent to deceive); Moore v. Maddock, 251 N.Y. 420, 424-25 (1929) (Although the "complaint contains no allegations of fraud … [a]n action for breach of warranty rests upon a contract which the law implies."); Campbell v. Muller, 43 N.Y.S. 233, 235 (N.Y. App. Term 1897) (stating that even an agent that believes it has authority is liable "although he is guilty of no intentional fraud or moral turpitude").  The fact that the agent has breached its implied warranty of authority subjects the agent to liability to the other contracting party, just as any contracting party is subject to liability for breaching a contract whether or not reliance is present.  See id.; Ogilvy Group Sweden, AB v. Tiger Telematics, Inc., Case No. 05-8488, 2006 WL 2473215, *2 (S.D.N.Y. Aug. 28, 2006) ("Reliance is not a required element of a breach of contract claim.").

Moore erroneously argues that the Bankruptcy Court committed reversible error by misapplying agency law.  Moore contends that while the Bankruptcy Court relied on the section of the Restatement (Third) of Agency § 6.10 that imposes liability on an agent who purports to make a contract on behalf of another lacking power to actually bind that person, it failed to apply an exception to such liability if "the third party knows" the agent was acting without actual authority.

First, as demonstrated above, New York courts have not accepted the Restatement's exception to the agent's liability under the implied warranty of authority.[24]  "The Restatement … is not the substantive law of New York and creates no rights not already incorporated by New York statutory and common law."  Encogen Four Partners v. Niagara Mohawk Power Corp.,

_____

[24]  Contrary to Moore's claim, Broughton v. Dona, 475 N.Y.S.2d 595 (3d Dep't 1984) did not adopt the Restatement position.  The court held that there was no implied warranty of authority because the defendant never warranted anything as the insurance contract at issue expressly stated that it was subject to approval by the home office.  Here, Moore warranted and represented that he, as President, was authorized to act on behalf of Chadmoore and that Chadmoore was legally capable of entering into the Chadmoore Put.

914 F. Supp. 57, 62 (S.D.N.Y. 1996); accord O'Shanter Resources, Inc. v. Niagara Mohawk Power Corp., 915 F. Supp. 560 (W.D.N.Y. 1996). Indeed, as far as counsel can tell, other than the Bankruptcy Court, no court in the United States has cited this section of the Restatement as authority. Even the Bankruptcy Court only cited the Restatement as additional authority to the New York cases imposing an implied warranty of authority.

Second, even if New York adopted the Restatement's exception, Moore is wrong when he argues that under the Restatement, the Bankruptcy Court's denial of summary judgment on Fund LLC's fraud claim mandated denial of summary judgment on Fund LLC's implied warranty claim. Moore is mixing apples and oranges. The Bankruptcy Court denied summary judgment on Fund LLC's fraud claim because reasonable reliance is an element of a fraud claim and the Bankruptcy Court found that there was an issue of fact as to whether Fund LLC "should have known" that Chadmoore was not authorized to enter into the Chadmoore Put because Fund LLC's counsel knew that Chadmoore was in dissolution. Mem. Dec. at 15. What Moore ignores is that even if the Restatement exception applied to Fund LLC's implied warranty of authority claim, it only applies where "the third party knows that the person who purports to make the contract, representation, or conveyance acts without actual authority." Restatement (Third) of Agency § 6.10 (emphasis added). The Restatement exception does not apply where the third party "should have known" that the agent was acting without actual authority.[25]

---

[25] Indeed, in commenting on identical language in the earlier version of the Restatement, the commentators to the Restatement (Second) of Agency § 329 state that an agent is liable under an implied warranty of authority even if the third party "has reason to know of the agent's lack of authority and has carelessly failed to realize it" (emphasis added).

Moore presented no evidence to the Bankruptcy Court that Fund LLC knew that Moore was not authorized to enter into the Chadmoore Put.[26] The most that Moore was able to assert is that Fund LLC <u>should have known</u> that he was not authorized to enter into the transaction because Fund LLC's counsel knew that Chadmoore was in dissolution and, therefore, Fund LLC should have known that Chadmoore purportedly was legally incapable of entering into the Chadmoore Put under Colorado law.  However, as the Restatement makes clear, "should have known" is not enough.  In any event, as demonstrated in Point IV.B.2, <u>infra</u>, Chadmoore's dissolution did not prevent it from entering into the Chadmoore Put.  Accordingly, Moore's Restatement argument fails.

**B.      Chadmoore's Dissolution Is Not A Defense To
         Fund LLC's Implied Warranty Of Authority Claim**

  **1.      New York Law is Clear, and the Bankruptcy Court Recognized, that
          An Officer that Contracts Without Authority on Behalf of a Dissolved
          Corporation is Personally Liable for the Corporation's Liabilities**

The Bankruptcy Court correctly rejected Moore's argument that he cannot be held liable under an implied warranty of authority theory because Moore's principal, Chadmoore, as a dissolved company, is allegedly not legally capable of entering into the Chadmoore Put.  The New York courts have repeatedly held on summary judgment that an officer who enters into contracts or acts without authority on behalf of a dissolved company is personally liable to third parties for the dissolved corporation's obligations.  See <u>Pennsylvania Bldg. Co. v. Schaub</u>, 789 N.Y.S.2d 112 (1st Dep't 2005); <u>Brandes Meat Corp. v. Cromer</u>, 537 N.Y.S.2d 177 (2d Dep't 1989) (granting summary judgment against officer who entered into contract on behalf of

---

[26]    As noted, the only contact that Moore said he had with Fund LLC was a communication in which Moore confirmed Chadmoore's ability to comply with the covenant of 110% coverage of cash to the Chadmoore Put obligation.  That demonstrates a state of mind that presumes the enforceability of the Chadmoore Put.

dissolved corporation); <u>Imero Fiorentino Assocs., Inc. v. Green</u>, 447 N.Y.S.2d 942, 943 (1st Dep't 1982) ("Since the individual defendant admits that he signed on behalf of a nonexistent principal, he is individually liable . . . ."); <u>Klein v. Guglielmi</u>, Index No. 100471/00, 2001 WL 1682934 (N.Y. Sup. Ct. Sept. 26, 2001) (same); <u>WorldCom, Inc. v. Sandoval</u>, 701 N.Y.S.2d 834, 837 (N.Y. Sup. Ct. 1999) (citing <u>Poritzky v. Wachtel</u>, 27 N.Y.S.2d 316 (N.Y. Sup. Ct. 1941)).[27]

Moore has not and cannot distinguish this authority. Nor has Moore cited any authority to the contrary.[28]

### 2. Chadmoore Was Legally Capable of Entering Into the Chadmoore Put

Moore's argument also fails for the independent reason that although Chadmoore was in dissolution, it was, in fact, legally capable of entering into the Chadmoore Put. Colorado's dissolution statute only disables a Colorado corporation from carrying out new or existing business; it does not prevent a dissolved corporation from carrying out activities that are incident to the winding up of its affairs. C.R.S. § 7-114-105 (2006).[29] One Colorado case interpreting the Colorado dissolution statute and an analogous statutory provision relating to administratively-dissolved corporations, has squarely held that the proposition that a "corporation suspended by

---

[27] There is a debate under New York law whether an officer is liable where he acts on behalf of an administratively-dissolved corporation that is later reinstated. <u>See</u> <u>Worldcom</u>, 70 N.Y.S.2d at 837. Where, however, the company was permanently dissolved (as was the case with Chadmoore), an officer is unquestionably liable for obligations that he purportedly incurred on behalf of the corporation.

[28] The two cases Moore relies upon do not involve dissolution. In <u>Dung v. Parker</u>, 52 N.Y. 494 (1873), the contract was invalid because it violated the statute of frauds. In <u>Broughton</u>, 475 N.Y.S.2d 595, the contract violated New York's insurance law. By contrast, the New York cases make it clear that an officer that contracts on behalf of a dissolved company is personally liable.

[29] Under common law dissolution and, similarly, the prior Colorado statute, dissolution was viewed as "analogous to the death of a natural person and abated lawsuits" and, thus, the corporation was unable to contract at all. <u>See</u> <u>generally</u> Model Business Corporation Act ("<u>MBCA</u>") § 14.05 at pp. 14-24. Under the Colorado dissolution statute enacted in 1994, applicable to this case, while the corporation must stop doing new business, it maintains its corporate existence and may carry on business related to winding up the corporate affairs. <u>Id.</u>; <u>see also</u> C.R.S. § 7-114-105.

statute cannot transact business or acquire any claims" is no longer relevant and that dissolved corporations may enter into post-dissolution contracts to sell their corporate assets, to pursue collection of a promissory note and otherwise enforce agreements.  See Awanderlust Travel, Inc. v. Kochevar, 21 P.3d 876, 878 (Colo. Ct. App. 2001).[30]

The Chadmoore Put was clearly the kind of transaction permitted under the Colorado dissolution statute.  It did not involve the transaction of new business by Chadmoore and had no relation to Chadmoore's former telecommunications business.  Rather, it was simply a short term secured investment by Chadmoore in debt securities that would have matured well before Chadmoore's final distribution of assets to shareholders in 2007.  Chadmoore's own securities filings reveal that in 2005, while in dissolution, Chadmoore was heavily invested in debt securities (both short term and long term) and there was nothing improper about it holding such positions.[31]  See generally Chadmoore 2002 – 2004 SEC Filings (AP docket no. 17, Ex. A-D), Vol. II, Tab QQ.[32]

---

[30]    Other state courts interpreting dissolution statutes have held that dissolved corporations can exercise an option to purchase real property (Bowditch v. 57 Laight St. Corp., 443 N.Y.S.2d 785, 788 (N.Y. Sup. Ct. 1981)), contract to acquire insurance (Igbara Realty Corp. v. New York Prop. Ins. Underwriting Ass'n, 463 N.Y.S.2d 211, 212 (1st Dep't 1983)), extend a lease (Kay Furniture Corp. v. Rovin, 20 N.W.2d 194, 195-96 (Mich. 1945)), or file a mechanic's lien on a project (see Schenectady Municipal Housing Auth. v. Keystone Metals Corp., 665 N.Y.S.2d 744, 746 (3d Dep't 1997)).

[31]    According to Chadmoore's public filings, Chadmoore sold its assets to Nextel in February 2002 and received $130 million, from which it netted approximately $103 million in cash after repaying its bank debt.  At or about the same time, Chadmoore filed its Articles of Dissolution.  Thus, it was a central function of winding up its affairs in administration to manage that cash and the investment returns thereon as funds were periodically distributed over the course of several years.

[32]    Chadmoore's 10-Q for the first quarter of 2005 makes it clear that during that quarter, Chadmoore, in an effort to maximize its return on its assets, invested in debt securities.  Its first quarter 2005 filing reports cash and cash equivalents of $2 million and "investment in debt securities of $11.7 million" (emphasis added).  The note to the first quarter 2005 financial statement described this new line item as follows:

> Investment in debt securities with maturities prior to February 2007 are carried at par value with an accrual in future estimated income for expected earnings to the total settlement amount.  Management intends to

(continued...)

The Chadmoore Put was an agreement to purchase a short-term secured investment in debt securities.  It was executed in November 2005, had a one year maturity, and matured by its terms on November 6, 2006.  See Chadmoore Put at ¶1, p.1, Vol. I, Tab B.  That was prior to the earliest date (February 2007) by which Chadmoore's dissolution was set to be completed. Chadmoore made debt investments to maximize the amount of the distribution to its shareholders. There is nothing impermissible about such investing activities under Colorado law or the law of any other state.

Indeed, in its brief below, Chadmoore acknowledged that it held some investments that were not low-risk.  See Chadmoore Opp. Mem. (AP docket no. 1412) at 8, Vol. II, Tab SS.  By acknowledging that it made some investments in less conservative debt instruments, it can hardly be argued that Chadmoore's investment in the Chadmoore Put was a prohibited investment for a dissolved Colorado corporation.

Chadmoore's entry into the Chadmoore Put was incident to the winding up of Chadmoore's affairs.  The Chadmoore Put was the proper act of a dissolved corporation under Colorado law.

---

hold these securities until their maturity due dates.  Those debt securities with maturities after February, 2007 are carried at market value with any periodic unrealized gain or loss recorded as an adjustment in the Statement of Changes in Net Assets in Liquidation.

See Chadmoore 2005 10-QSB (AP docket no. 115, Ex. BB) at p. 7, Vol. II, Tab RR.

Moreover, the notes to the first quarter 2005 financial statements, in describing the estimated future interest income to be earned by Chadmoore, state: "During 2005, management invested excess cash amounts in debt securities with varying maturities."  Furthermore, the notes to the financial statements, in describing the increased amount of estimated future interest income, attribute the increase in future interest income to an increase in interest rates and Chadmoore's investment in debt securities.  See id. at p. 12.  Thus, according to Chadmoore's public filings, Chadmoore heavily invested in debt securities during its dissolution and in connection with the winding up of its affairs.

### 3. Chadmoore Was Precluded From Challenging the Enforceability of the Chadmoore Put Under Colorado Law

Even if Chadmoore was legally disabled from entering into the Chadmoore Put, as a matter of law, Chadmoore could not defend against the enforceability of the Chadmoore Put by arguing that the act was ultra vires in the first place because Section 7-103-104 of the Colorado Business Corporation Act (2006) prohibits a Colorado corporation from using its own ultra vires acts as a defense to an action brought by a third party seeking to enforce a contract with the corporation.[33]  While there are no Colorado cases interpreting the Colorado statute, other state courts, interpreting identical or similar statutes, have held that a corporation that has engaged in ultra vires acts, may not invoke ultra vires as a defense to a claim brought against it based on those acts.  See, e.g., Bryant Constr. Co., Inc. v. Cook Constr. Co., Inc., 518 So.2d 625, 630 (Miss. 1987); 711 Kings Highway Corp. v. F.I.M.'s Marine Repair Service, Inc., 273 N.Y.S.2d 299, 301 (N.Y. Sup. Ct. 1966).

For all these reasons, Moore's principal, Chadmoore, is legally bound by the Chadmoore Put and the factual premise of Moore's argument fails.[34]  Accordingly, summary judgment against Moore was proper.

---

[33]  Section 7-103-104 of the Colorado Business Corporation Act (2006) provides that, with limited exceptions not applicable here, "the validity of a corporate action may not be challenged on the ground that the corporation lacks or lacked power to act."

[34]  Moore has it backwards when he argues that the Bankruptcy Court's decision to grant summary judgment rather than conduct a trial on Moore's baseless claims against Fund LLC and its counsel, violates his rights to a "just, speedy and inexpensive determination" of his claims under Fed. R. Civ. P. 1.  See App. Br. at 15-16.  The Bankruptcy Court's granting of summary judgment against Moore is entirely consistent with Rule 1.  As the Supreme Court has stated: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1); see also Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); Live Nation Worldwide, Inc. v. GTA, Inc., Case No. 07-483, 2007 WL 1489761, *3 (S.D.N.Y. May 18, 2007).  "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such
(continued...)

**IV.  FUND LLC's CROSS-APPEAL:  THE BANKRUPTCY COURT ERRED
     IN GRANTING SUMMARY JUDGMENT IN FAVOR OF MOORE
     ON THE COLORADO PERSONAL LIABILITY STATUTE**

The Bankruptcy Court erred in granting summary judgment to Moore on Fund LLC's alternative theory that Moore was liable to Fund LLC under Colorado's personal liability statute, C.R.S. § 7-102-104.  Ignoring recent revisions to the Colorado statute that broadened its scope and instead relying on Colorado case law construing an older and narrower predecessor statute, the Bankruptcy Court held that C.R.S. § 7-102-104 only applied to pre-incorporation activities and thus did not cover Moore's misconduct.  Mem. Dec. at 10-11, Vol. I, Tab A.  The Bankruptcy Court's ruling misconstrued the Colorado statute and should be reversed.

The Colorado personal liability statute was originally enacted in 1958 as part of the Colorado Corporation Act of 1958.[35]  The 1958 statute was identical to section 139 of the 1950 MBCA, which was designed to impose personal liability for pre-incorporation activities.  In 1985, the drafters of the MBCA amended that section (renumbered as Section 2.04) to add the words "knowing that there was no incorporation."  However, in 1993, when the Colorado legislature amended the Colorado personal liability statute, while it added the words "on behalf of a corporation," it did not add the words "knowing there was no incorporation under the Act," which suggests that the Colorado legislature intended the statute to apply to post-incorporation acts taken by those acting on behalf of the corporation.  The current version of the Colorado personal liability statute at issue thus provides that:

---

claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."  Catrett, at 327.

[35]  The statute as originally enacted read:  "All persons who assume to act *as a corporation* without authority to do so shall be jointly and severally liable for all debts and liabilities occurring or arising as a result thereof."  C.R.S. § 7-3-104 (1973) (emphasis supplied).

> All persons purporting to act as *or on behalf of* a corporation
> without authority to do so and without good faith belief that they
> have such authority shall be jointly and severally liable for all
> liabilities incurred or arising as a result thereof.

C.R.S. § 7-102-104 (2006) (enacted in 1994; previously codified as § 7-3-104) (emphasis

supplied).

The plain language of the statute clearly covers Moore's misconduct because Moore

admitted that he acted on behalf of Chadmoore without authority to do so and without a good

faith belief that he had authority to act on Chadmoore's behalf.  That should end the inquiry.[36]

The Bankruptcy Court erred in interpreting the current version of the Colorado statute by

relying on Colorado precedent interpreting the older and narrower version of the statute.  While

acknowledging that no Colorado court has **ever held** that C.R.S. § 7-102-104 is limited to pre-

incorporation events, the Bankruptcy Court nonetheless relied upon three Colorado cases

interpreting the earlier and narrower iteration of the statute to reach its erroneous conclusion:

Micciche v. Billings, 727 P.2d 367, 371 (Colo. 1986); Sims v. Ottenhoff, 879 P.2d 436 (Colo. Ct.

App. 1994); and Jean Claude Boisset Wines USA, Inc. v. Newton, 830 P.2d 1134 (Colo. Ct. App.

1992).

Micciche dealt with the "effect of section 7-3-104 of the Colorado Corporation Code on

the personal liability of a corporate officer for corporate debts and liabilities incurred during a

period when the corporation had been suspended from transacting business in Colorado as a

---

[36] It is well established that "when a statute's language is plain, the sole function of the courts, at least
where the disposition by the text is not absurd, is to enforce it according to its terms."  Hartford
Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 7 (2000); see also Connecticut Nat'l
Bank v. Germain, 503 U.S. 249, 253 (1992) ("When the words of a statute are unambiguous, then, this
first canon is also the last: the judicial inquiry is complete."); United States v. Ron Pair Enters., 489
U.S. 235, 240 (1989).  It must be presumed that a legislative body, in this case the Colorado state
legislature, "says in a statute what it means and means in a statute what it says there."  Germain, 503
U.S. at 254.

result of its failure to file the corporate report required" – an analysis under another section of the Colorado Corporation Code than is at issue here. Id. 727 P.2d at 368. The Court in Micciche framed the questions presented in that matter to the limited issue of "whether the court of appeals erred in holding that section 7-3-104 authorized the imposition of personal liability for corporate obligations on a corporate officer solely because he was an officer when the obligation was incurred." Id. at 369 (emphasis added).

Thus, the limited holding of Micciche is that corporate officers cannot be held personally liable under section 7-3-104 while the corporation was operating under a suspended status but was still a valid legal entity because to impose liability "would be anomalous in the extreme" as it would involve construing section 7-3-104 in a manner that "exposes corporate officers to substantial legal obligations solely on the basis of the corporation's failure to seek reinstatement." Id. at 372 (emphasis added). In refusing to impose liability on corporate officers under this specific factual scenario, the Micciche Court noted that its interpretation was supported by "case law from other jurisdictions holding that no personal liability should be imposed on corporate officers solely on the basis of the corporation's" suspended status. Id. at 371-72. The Court further noted that a contrary interpretation would be inconsistent with the fact that another section of the Colorado Corporation Code permits a suspended corporation to be reinstated resulting in the corporate powers retroactively being regarded as having existed through the period of suspension and that, "under Colorado case law, corporate officers conducting business are not liable for debts incurred during the period of suspension." Id. at 372 (emphasis added).

The Bankruptcy Court's reliance on Micciche was thus misplaced for several reasons. First, as described above, it involved a different and much more constricted Colorado personal liability statute (C.R.S. § 7-3-104) than the one at issue here (C.R.S. § 7-102-104). There is a significant difference between the language of the predecessor Colorado statute that was

examined by the Micciche Court and the current Colorado personal liability statute. Whereas the statute before the Micciche Court imposed liability on "[a]ll persons who assume to act as a corporation without authority to do so," the current Colorado personal liability statute was broadened to impose liability on "[a]ll persons purporting to act as or on behalf of a corporation . . . ." See C.R.S. § 7-102-104. The plain meaning of the words "on behalf of a corporation," suggests that the statute was intended to cover not only acts taken by those purporting to act as a corporation, i.e., acts taken by a person where there was no actual corporate existence, such as in the pre-incorporation scenario, but also to acts occurring once the corporation is in existence.[37]

Second, Micciche is readily distinguishable because, in that case, the corporate officers engaged in no wrongful conduct and liability was sought against them solely because they were officers of a suspended corporation. By contrast, Fund LLC is seeking to hold Moore personally liable because he entered into the transaction on Chadmoore's behalf without authority to do so and, by his own admission, engaged in wrongful and deceptive conduct. See Moore Am. Answ. at ¶¶ 9, 83, Vol. I, Tab V.

Third, Micciche is distinguishable because the incident at issue in Micciche occurred when the corporation was suspended, not dissolved, whereas this case involves a corporation in voluntary dissolution. The Micciche Court made clear that it was addressing the very narrow issue of the effect of the predecessor personal liability statute "on the personal liability of a corporate officer during a period when the corporation had been suspended" for failing to file the corporate report required under Colorado law.   Micciche, 727 P.2d at 368 (emphasis added).

---

[37]   The Micciche court's limited decision is further underscored by its noting that Section 7-3-104 was "identical to section 139 of the 1950 Model Business Corporation Act" which it further noted had been amended in 1985 to provide that "All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation under this Act . . . ." Micciche, 727 P.2d at 370; (emphasis added).

And, as described above, part of the Colorado Supreme Court's rationale for not imposing personal liability on the corporate officer was that, since the corporation was suspended for failing to file an annual report, it could have been reinstated, and, under the relevant case law, in such circumstances, corporate officers had no personal liability. This case could not be more different. Chadmoore was dissolved in February 2002 and, contrary to the Bankruptcy Court's finding, the fact that Chadmoore was dissolved and could not be <u>reinstated</u> is significant. Chadmoore was not the subject of an administrative suspension for failure to file required reports. Nor could Chadmoore <u>be reinstated</u> when it entered into the Chadmoore Put.[38]

The Bankruptcy Court should have applied the plain language of the Colorado statute, rather than rely on Colorado decisions interpreting an earlier and narrower version of the Colorado statute. The Bankruptcy Court's grant of summary judgment for Moore should be reversed and summary judgment should be granted in Fund LLC's favor on the additional and alternative theory that Moore is personally liable to Fund LLC under C.R.S. § 7-102-104.

## V.    **THE PRELIMINARY INJUNCTION WAS APPROPRIATE**

Moore argues that the preliminary injunction was entered in error because it was essentially a prejudgment attachment in favor of Fund LLC. App. Br. at 35-37. Moore's

---

[38]    The two other cases cited by the Bankruptcy Court – <u>Sims v. Ottenhoff</u>, 879 P.2d 436 and <u>Jean Claude Boisset Wines USA, Inc. v. Newton</u>, 830 P.2d 1134 – are similarly inapposite. In <u>Sims</u>, the Colorado appellate court found that the directors were not liable for acts of the corporation because the directors had no knowledge of the corporation's dissolution status; in other words, the directors did not engage in any wrongdoing. Indeed, the implication is that if the directors knew of the dissolved status, they would have been personally liable. Unlike in <u>Sims</u>, Moore was well aware of Chadmoore's dissolution status. In <u>Jean Claude Boisset</u>, the Colorado appellate court found the officer liable because, unlike <u>Micciche</u>, but like the case here, the officer engaged in wrongful conduct. There, the officer's good faith in believing that he had authority to act for the corporation was irrelevant because the "defendant took no steps to comply with relevant Colorado statutes to incorporate . . . ." <u>Jean Claude Boisset</u> at 1134. While the case is irrelevant because it involved pre-incorporation activities, there is nothing in that case that even remotely suggests that the statute is limited to pre-incorporation situations.

characterization of the preliminary injunction as a pre-judgment attachment order of the type that was dismissed in <u>Grupo Mexicano</u>, 527 U.S. 308, is wrong.[39]

## A.    The Preliminary Injunction Was Not An Improper Prejudgment Attachment And Did Not Violate *Grupo Mexicano*

Moore ignores the wealth of cases that have distinguished <u>Grupo Mexicano</u> on its facts and approved asset-freezing injunctions in anticipation of judgments on fraudulent transfer claims or demands for accountings.[40]  The injunction entered by the Bankruptcy Court required Moore to deposit into escrow the $423,535.50 dividend he received as part of the improper shareholder distribution by Chadmoore in October 2006.  That dividend was supposed to be held in escrow by his lawyers pending resolution of the lawsuit.  Had it been a prejudgment attachment, as Moore contends, Fund LLC would have frozen Moore's accounts immediately and initiated foreclosure actions.[41]

In addition, <u>Grupo Mexicano</u> addressed the propriety of an injunction imposed by a district court.  By contrast, a bankruptcy court has a broad range of equitable powers it can exercise in cases within the confines of its jurisdiction.  <u>See</u> 11 U.S.C. § 105(a) (bankruptcy court

---

[39]    Moore also relies on a state case, <u>Credit Agricole Indosuez v. Rossiyskiy Kredit Bank</u>, 94 N.Y.2d 541 (2000), to argue that a preliminary injunction cannot be obtained in furtherance of a breach of contract claim.  It is unclear how that state law case would apply to a question of whether an injunction was properly entered under federal law, Fed. R. Civ. P. 65, and the decision would add nothing to this analysis even if it applied.

[40]    <u>See</u>, <u>e.g.</u>, <u>Rubin v. Pringle (In re Focus Media, Inc.)</u>, 387 F.3d 1077, 1085 (9th Cir. 2004) ("[W]e hold that where, as here, a party in an adversary bankruptcy proceeding alleges fraudulent conveyance or other equitable causes of action, <u>Grupo Mexicano</u> does not bar the issuance of a preliminary injunction freezing assets."); <u>United States ex rel. Rahman v. Oncology Assocs., P.C.</u>, 198 F.3d 489, 496-97 (4th Cir. 1999) (same); <u>CSC Holdings, Inc. v. Redisi</u>, 309 F.3d 988, 996 (7th Cir. 2002) (<u>Grupo Mexicano</u> did not bar asset freeze where, in addition to money damages, plaintiff sought accounting and resulting profits).

[41]    In fact that is not what happened; instead, Moore continued dissipating his assets, spending money at an exorbitant rate and transferring assets and control over his trusts and other asset protection vehicles to friends and other trusted accomplices in an effort to frustrate an eventual judgment in favor of Fund LLC.  Ex. A at p. 6-22, to September 18 Hrg. Tr., Vol. IV, Tab C.

may issue any order "necessary or appropriate to carry out the provisions of this title").  Courts in this District have expressly relied on that distinction in ruling that the Bankruptcy Court may issue injunctive relief preventing a defendant from disposing of assets in advance of a judgment. See Adelphia Comms. Corp. v. Rigas (In re Adelphia Comms. Corp.), Case No. 02-8495, 2003 WL 21297258, *4 (S.D.N.Y. June 4, 2003) (Daniels, J.) ("Grupo Mexicano's holding specifically applied to the district courts, and therefore is inapplicable in the bankruptcy court context.").[42]

To the extent it would even apply to a bankruptcy court exercising its equitable powers under section 105(a), Grupo Mexicano is also distinguishable on the basis that it involved a claim solely for money damages, not equitable relief.  Grupo Mexicano addressed an injunction freezing the defendants' assets pending adjudication of a breach of contract claim.  Courts interpreting Grupo Mexicano have uniformly determined that its holding does not bar asset-freezing injunctions where the plaintiff made both legal and equitable claims.  Adelphia Comms. Corp. v. Rigas (In re Adelphia Comms. Corp.), 323 B.R. 345, 360 n.18 (Bankr. S.D.N.Y. 2005).[43]

Contrary to Moore's claims (App. Br. at 36), the preliminary injunction was in furtherance of equitable claims.  Count X of the Complaint is a fraudulent transfer claim seeking

---

[42] See also Official Comm. of Unsecured Creditors v. Sphinx Managed Futures Fund SPC (In re Refco Inc.), Case No. 05-03331 (Bankr. S.D.N.Y. Dec.16, 2005) (Drain, J.) (entering ex parte TRO (docket no. 6) prohibiting the defendants from transferring or disposing of any assets unless they retain assets sufficient to cover the face amount of the Committee's preference claim of $312 million); Green v. Drexler (In re Feis & Drexler Inc.), 760 F.2d 406, 414 (2d Cir. 1985) .

[43] See, e.g., Focus Media, 387 F.3d at 1085 (fraudulent transfer); CSC Holdings, 309 F.3d at 996 (accounting, profits); Oncology Assocs., 198 F.3d at 496-97 (fraudulent transfer); Motorola Credit Corp. v. Uzan, 202 F. Supp. 2d 239, 250 (S.D.N.Y. 2002) (Rakoff, J.) (constructive trust); Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va., 144 F. Supp. 2d 241, 249-50 and n.9 (S.D.N.Y. 2001) (Owen, J.) ("[C]ourts since Grupo Mexicano have found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets.") (emphasis in original); Wishnatzki Natel, Inc. v. H.P. Island-Wide, Inc., Case No. 00-8051, 2000 WL 1610790, *1 (S.D.N.Y. Oct. 27, 2000) (Martin, J.) (same); Adelphia Comms. Corp. v. Rigas, 2003 WL 21297258 at *5 (where estate asserted claims not only for money damages but also for equitable relief – imposition of a constructive trust and an accounting – Grupo Mexicano was inapplicable).

the recovery of the improper dividend Moore received from Chadmoore in October 2006.  That relief is equitable in nature, not compensatory.  Fund LLC also sought an accounting from Moore (Count XIII), which is an equitable claim outside the purview of <u>Grupo Mexicano</u>.  <u>See</u>, <u>e.g.</u>, <u>CSC Holdings</u>, 309 F.3d at 996; <u>cf.</u> <u>S.E.C. v. Cavanaugh</u>, 445 F.3d 105, 115 (2d Cir. 2006) (accounting and disgorgement of profits in securities case is an equitable remedy).

**B.    The Bankruptcy Court's Entry Of The Preliminary Injunction**
**Based On The Record Below Was Not An Abuse Of Discretion**

Moore argues ) that the Court lacked an evidentiary basis to conclude for purposes of injunctive relief that Fund LLC had no adequate remedy at law.  App. Br. at 37.  To the contrary, the order itself made findings: of a substantial likelihood that Moore (and Radusch) acted improperly in connection with the Chadmoore Put; of a substantial likelihood that Chadmoore's assets were not sufficient to satisfy in full a judgment in favor of Fund LLC on the Chadmoore Put; that, in the event that Chadmoore's assets were insufficient to satisfy a judgment in favor of Fund LLC or the Chadmoore Put was determined to be unenforceable, Fund LLC would look to hold Moore (and Radusch) accountable; and that, but for the injunctive relief, Moore (and Radusch) would be free to dissipate assets and dissipate the improper shareholder distributions they paid themselves.  <u>See</u> PI Order at ¶¶ C-F, Vol. I, Tab G.  All that the law requires for a preliminary injunction is that a court make preliminary findings based upon the record in the case concerning "(1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) a balance of hardships tipping decidedly toward the party seeking the injunctive relief."  <u>See</u> <u>Payment Alliance Intern, Inc. v. Perreira</u>, Case No. 07-8685, 2007 WL 4698605, *2 (S.D.N.Y Dec. 13, 2007).  It was not an abuse of discretion for the Bankruptcy Court to issue the preliminary injunction under those circumstances.

## VI.    THE CONTEMPT FINDING WAS SUPPORTED

Moore also argues that the Bankruptcy Court's judgments finding him in contempt of the PI Order were plainly erroneous because they lacked evidentiary support.[44]  In order to find a party in civil contempt, "the court need only (1) have entered a clear and unambiguous order, (2) find it established by clear and convincing evidence that that order was not complied with, and (3) find that the alleged contemnor has not clearly established his inability to comply with the terms of the order."  See Huber, 51 F.3d at 10.  Upon a prima facie showing of civil contempt, the burden shifts to the alleged contemnor to prove his inability to comply with the order.  See id. (citing United States v. Rylander, 460 U.S. 752, 757 (1983); McPhaul v. United States, 364 U.S. 372, 379 (1960); Maggio v. Zeitz, 333 U.S. 56, 75-76 (1948)).  Here, as demonstrated below, the Bankruptcy Court was correct in concluding that Fund LLC made a prima facie showing of civil contempt and that Moore failed to carry his burden of establishing his inability to post any of the required escrow.

### A.    Moore Failed To Carry His Burden Of Establishing His Inability To Post Any Of His Required Escrow

Contrary to Moore's claims (App. Br. at 37-39), there can be no credible argument that the Bankruptcy Court did not make an adequate record to hold Moore in contempt.  Fund LLC made a prima facie showing of civil contempt.  The terms of the PI Order were clear and unambiguous; Moore was supposed to post an escrow of $423,535.50 (i.e., his share of the improper shareholder distribution from Chadmoore in October 2006) by May 7, 2007.  Moore

---

[44]    It is well accepted that bankruptcy courts have power to enter civil contempt orders.  Fed. R. Bankr. P. 9020; In re MarketXT Holdings Corp., Case No. 04-12078, 2006 WL 408317, *1 (Bankr. S.D.N.Y. Jan. 27, 2006).  Here, the contempt proceedings against Moore "arose in" the chapter 11 case and qualify as a "core" proceeding.  On appeal, determinations of civil contempt and the imposition of sanctions are reversed only upon an abuse of discretion.  Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).

filed a pleading admitting his failure to post any of his escrow, <u>see</u> Moore Notice, Vol. II, Tab HH, and does not dispute that, in the nine months since, he has made <u>no</u> deposits toward his escrow.

On that admission alone, the burden was Moore's to establish "clearly, plainly, and unmistakably" that he has a "complete inability, due to poverty or insolvency," to comply. <u>Huber</u>, 51 F.3d at 10.[45]  He was further obligated to establish that he made "in good faith all reasonable efforts to comply."  <u>S.E.C. v Bilzerian</u>, 112 F. Supp. 2d 12, 26 (D.D.C. 2000) (and cases cited).  Moreover, even if he could establish an inability to make the full deposit, he was obligated to pay what he could.  <u>See</u>, <u>e.g.</u>, <u>S.E.C. v. Musella</u>, 818 F. Supp. 600, 602 (S.D.N.Y. 1993); <u>see also</u> <u>S.E.C. v. Porto</u>, 748 F. Supp 671, 672 (N.D. Ill. 1990); <u>Piambino v. Bestline Prods., Inc.</u>, 645 F. Supp. 1210, 1214 (S.D. Fla 1986).

Thus, to establish an inability to post his escrow, Moore had to show that he made all reasonable efforts to raise the money.  <u>S.E.C. v. Bremont</u>, Case No. 96-8771, 2003 WL 21398932, *5 (S.D.N.Y. June 18, 2003).  Making "all reasonable efforts" would ordinarily include recovering monies disbursed to friends, relatives or associates.  <u>See</u> <u>Bremont</u>, 2003 WL 21398932 at *6; <u>CFTC v. Wellington Precious Metals</u>, 950 F.2d 1525, 1530 (11th Cir. 1992). For example, Moore would have had to establish that he had no ability to recover the $195,757.26 he transferred to one asset protection vehicle, NDMS Investments, L.P., in November 2006.  It is clear from the account statements that were produced for that entity, introduced into evidence by Fund LLC at the September 18 hearing, that he used the account as his own "piggy bank" to pay personal expenses such as lawyers, four or five mortgages, credit card debt, etc.  <u>See</u> Sept. 18

---

[45]   Moore argues that the burden was Fund LLC's to establish that Moore had cash to meet his escrow requirement.  App. Br. at 38.  That is not the law and, even if it were, the record below supports the Bankruptcy Court's determination that Moore could have made at least a partial payment toward his escrow requirement and elected not to do so.

Hrg. Tr. at pp. 10–13, Vol. IV, Tab A; Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.), at pp. 6-7 & Exh. F of Supp. Acct. (NDMS Bank Stmt.), Vol. IV, Tab A.  Further, merely requesting the money's return is insufficient to avoid a contempt finding when greater leverage, such as legal action, is available.  United States v. Hayes, 722 F.2d 723, 726 (11th Cir. 1984).

Moore failed to establish a complete inability to post any of his escrow.  See Moore Notice, Vol. II, Tab HH.  He filed an affidavit in which he claimed to have no money or assets to pay any portion of his escrow but those self-serving assertions are belied by the record developed regarding his personal finances and post-injunction spending.  See Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.) at pp. 6-7 and Exh. F & H of Supp. Acct. (Bank Stmts), Vol. IV, Tab A.

The record reflects that, over time, Moore engaged in a series of transfers (to trusts and other asset protection vehicles) designed to put his assets out of the reach of Fund LLC.  See Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.) at pp. 4-22, Vol. IV, Tab A; see also Further Contempt Stmt. at pp. 7-10, Vol. II, Tab KK.  Thus, Moore's burden was even higher because his alleged inability to post his escrow was self-created.  See Bilzerian, 112 F. Supp. 2d at 17, 28; Piambino, 645 F. Supp at 1215 ("Inability to comply with a court order may be a defense to a charge of contempt . . . but not if the defendant created his own inability").  It is evident from even his partial supplemental accountings admitted into evidence at the September 18 hearing – see Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.), Vol IV, Tab C; Further Contempt Stmt. at pp. 5-8, Vol. II, Tab KK – that Moore embarked on schemes to shelter his assets when it became apparent that he would be sued by Fund LLC or Chadmoore for signing the Chadmoore Put without authority and representing that he had all required approvals.

**B.**     **The Bankruptcy Court Properly Determined That Moore Failed To Make The Complete And Accurate Financial Disclosures Required**

In addition to failing to post any of his required escrow, which in and of itself supports the Bankruptcy Court's finding of contempt, Moore also repeatedly failed to make complete and accurate financial disclosures as required by the PI Order and subsequent contempt orders, which also justified the imposition of sanctions against him.  From the very outset, Moore disregarded the requirements of the PI Order.  His first accounting was produced late and contained no supporting documentation for his disclosures for which he was held in contempt.  See Ex. C. to Contempt App., Vol. II, Tab II.  His supplemental accounting also lacked supporting documentation for some of the transactions described in his supplemental accounting, such as bank statements for American Tradition MT, LC ("ATM") and tracing of May 25 sale proceeds.  See Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.) at p.6 and Exh. A, Vol. IV, Tab A.  Despite representations made by Moore's counsel that every transfer was accounted for in his initial accounting, the supplemental accounting listed 22 more transfers than the first accounting.

One clear example of Moore's blatant disregard for the PI Order and the Contempt Orders was his sale of real property located at 5885 Via Manigua, Las Vegas, Nevada in August 2007.[46] Moore purposefully concealed his interest in 5885 Via Manigua in violation of the disclosure

---

[46] According to property records, prior to November 2006, Moore owned a 2/3 interest in the property and his then-girlfriend, Ms. Sheradin, owned a 1/3 interest.  On or about November 2, 2006 (i.e., after Moore's counsel initiated discussions with Fund LLC regarding the Chadmoore Put, and only days before the Chadmoore Put matured as scheduled on November 6, 2006), Moore transferred his interest in the property to one of his trusts, the NDMS Living Trust, for no consideration.  According to Moore's supplemental disclosures, he is the trustor, trustee and beneficiary of the NDMS Living Trust.  As a result, following the transfer, he still owned and controlled the 2/3 interest in 5885 Via Manigua that he transferred to his NDMS Living Trust.  See Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.) at pp. 4 & 10, Vol. IV, Tab C.  Two weeks later, Moore caused NDMS Living Trust to transfer his interest in the property to ATM for no consideration.  See id. at p. 10.  Moore owns and controls ATM; hence, he still owned and controlled the 2/3 interest in the property.  See Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.) at Exh. A, Vol. IV, Tab C.  In August 2007, the property was sold, and Ms. Sheradin signed both as the managing member of ATM and personally on account of her 1/3 interest.  She promptly resigned and was replaced by Moore's current girlfriend, Cynthia Horner.

requirements of the PI Order and Contempt Order.  In his initial disclosures, Moore claimed he

had no interest in any real property and disclosed that, in October 2006, he transferred a "2/3

interest in encumbered real property" to an undisclosed recipient for no consideration.  Moore's

supplemental disclosures identified the recipient of the October 2006 transfer of his "2/3 interest

in encumbered real property" as one of his shell companies, American Tradition MT, LLC

("ATM"), but did not identify the property or provide any specifics.  See Supp. Acct. (Ex. A to

Sept. 18 Hrg. Tr.) at p. 10, Vol. IV, Tab A.  On May 24, 2007 (the day of the first contempt

hearing), he "resigned" from ATM and appointed as replacement manager an ex-girlfriend,

Alyson Sheradin.  See Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.) at Exh. A (last page),Vol. IV, Tab

A.  In August 2007, ATM sold the property.  Moore did not disclose the sale to Fund LLC.  At no

time since the PI Order or contempt proceedings has Moore accounted for these sale proceeds.

See Supp. Acct. (Ex. A to Sept. 18 Hrg. Tr.), Vol. IV, Tab A.  Further, as ATM was a Moore

Transferee, as defined in the Contempt Order, the sale of the property and the change of control

were both in violation of the Contempt Order and justified the Bankruptcy Court's entry of the

Second Contempt Order.

   In total, the Bankruptcy Court presided over three separate contempt hearings.  It was

only after giving Moore numerous attempts to complete his disclosures that the Bankruptcy Court

held Moore in contempt and imposed sanctions.  The record before the Bankruptcy Court more

than adequately supported the finding that Moore was in contempt both for failing to post his

escrow and for not completing his required disclosures.

## CONCLUSION

For all of the foregoing reasons, the Bankruptcy Court's judgments granting summary judgment against Moore on Count VI of the Complaint for breach of the implied warranty of authority under New York law, the PI Order, and imposing contempt sanctions against Moore should be affirmed and its ruling granting summary judgment in favor of Moore on the Colorado personal liability statute should be reversed.

Dated: New York, New York
February 1, 2008

IBF FUND LIQUIDATING LLC

By: _____

Arthur J. Steinberg
Aaron Rubinstein (AR 2083)
Heath Rosenblat (HR 6430)
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000